UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
TERRY VAN MEAD              * CRIMINAL FILE NO. 11-87




SENTENCING
Tuesday, October 2, 2012
Burlington, Vermont




BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        District Judge


APPEARANCES:

    CHRISTINA NOLAN, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    STEVEN L. BARTH, Assistant Federal Public Defender,
        Office of the Federal Public Defender, District
        of Vermont, 126 College Street, Suite 410,
        Burlington, Vermont; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

1    TUESDAY, OCTOBER 2, 2012

2    (The following was held in open court at 2:40 p.m.)

3             COURTROOM DEPUTY:  This is case number 11-87,

4    United States of America versus Terry Van Mead.  The

5    government is present through Assistant United States

6    Attorney Christina Nolan.  The defendant is present in

7    the courtroom with his attorney, Steven Barth.

8         The matter before the Court is sentencing.

9             THE COURT:  All right.  Mr. Barth, have you

10   received a copy of the presentence report?

11            MR. BARTH:  Yes, your Honor.

12            THE COURT:  Have you gone over that with Mr.

13   Mead?

14            MR. BARTH:  I have, your Honor.

15            THE COURT:  Any factual inaccuracies in the

16   report?

17            MR. BARTH:  No.  We commented on those and

18   were incorporated into the final draft that went to

19   your Honor.

20            THE COURT:  All right.  Mr. Mead, have you

21   read the report?

22            THE DEFENDANT:  Yes, I have.

23            THE COURT:  Have you gone over that report

24   with Mr. Barth?

25            THE DEFENDANT:  Yes, I have.

1          THE COURT:  Any factual mistakes that you saw

2    in the report?

3          THE DEFENDANT:  None that I am aware of.

4          THE COURT:  All right.  Ms. Nolan any factual

5    errors?

6          MS. NOLAN:  No, your Honor.  Thank you.

7          THE COURT:  All right.  I have read the

8    presentence report and I have read the sentencing

9    memorandum of the government and the defense.  Obviously

10   the Court has addressed one of the outstanding issues in

11   a written opinion.

12       The issues outstanding are a request for a

13   non-guideline sentence raised by the defendant and also

14   the government is objecting to not including the

15   four-level increase for "in relationship to another

16   offense," that's possession of the firearms in relation

17   to another offense.  I think those are the issues

18   outstanding; is that correct?

19         MR. BARTH:  I think there's some additional

20   issues outstanding, your Honor.  I had filed an

21   objection to the increase for crimes of violence on two

22   different crimes, both the burglary, second degree, and

23   the statutory rape provision.  Your Honor specifically

24   ruled on one of my arguments with regard to the

25   statutory rape provision.  I also raised a vagueness

1    claim with regard to the residual clause which

2    your Honor relied on in its hold -- finding that

3    statutory rape provision was a crime of violence under

4    4B1.2 and United States versus Daye.

5         While I suspect that the Court is not going to find

6    a residual clause is void for vagueness, I just wanted

7    to bring that to the Court's attention that is preserved

8    for appellate review.

9              THE COURT:  Okay.  The Court implicitly

10   found --

11             MR. BARTH:  Sure.

12             THE COURT:  -- that it was not void for

13   vagueness and will rely upon that in its written order.

14             MR. BARTH:  Of course.

15             THE COURT:  All right.

16             MR. BARTH:  The other crime which was relied

17   on by the probation office was the burglary.  The

18   burglary remains an outstanding issue.  While I -- while

19   the probation office relied on the residual clause there

20   so the void-for-vagueness argument would apply to that

21   enhancement as well, I also raise an issue that we don't

22   know, the record is not clear as to what Mr. Mead was

23   convicted of.

24        You may remember, in my initial sentencing papers,

25   I attached both the charging document as well as what

1    amounted to a judgment and conviction document.  It's

2    not what it was entitled but I think it was uniform

3    conviction document or some -- I forget the title of it.

4    But those two documents conflicted.  And it was unclear

5    to me, absolutely unclear, what exactly, if anything,

6    Mr. Mead was convicted of.  And the probation office, in

7    its response to my objection, which I sent to them prior

8    to our initial sentencing hearing, acknowledged that the

9    documents were somewhat confusing in that it's unclear

10   what if anything he was convicted of.

11        They then went ahead and relied on a presentence

12   report to find that this was a burglary of a dwelling.

13   I objected to that saying that burglary of a dwelling

14   cannot be used to determine what a defendant was

15   convicted of when you are determining whether something

16   is a crime of violence.  Again, that would be a

17   categorical analysis.  I believe you can only rely on

18   so-called Shepard documents --

19                THE COURT:  Right.

20                MR. BARTH:  -- whereas the PSR is not --

21                THE COURT:  I want to take a look at that

22   again, so we're going to take a break in a few minutes,

23   but let me first deal with the issue about the

24   four-level increase.

25        Ms. Nolan, do you have --

 1           MS. NOLAN:  Well, your Honor, before you went

 2    and looked at it, I just wanted to make a few comments

 3    in response, if I could.

 4           THE COURT:  Sure.

 5           MS. NOLAN:  We provided a -- the first

 6    certified record of conviction that we got from the

 7    convicting court indicated that he pled to Count 2,

 8    which was burglary of a building as charged in the

 9    indictment.  The presentence report indicates that he

10    pled to burglary -- attempted burglary of a dwelling.

11        We went back to the convicting court -- which was

12    Count 4 as charged in the indictment, and all of the

13    papers are attached in my sentencing memo.  We went back

14    to the convicting court and they said it is -- it was an

15    error, it wasn't accurate to say that it was Count 2.

16    It was actually Count 4 that he pled to, which is

17    attempted burglary of a dwelling.  And they updated

18    their certification; I have attached it to my memo.

19        Whether he pled to attempted burglary of a

20    dwelling, burglary of a dwelling, or burglary of a

21    building is really -- all three of those are crimes of

22    violence under very clear Second Circuit case law.

23        The Brown case, which I mentioned at the last

24    hearing, held that burglary of a building, the very

25    statute that was charged in the indictment as to Mr.

1    Mead, is a crime of violence.  I don't think there's any

2    dispute or any question that burglary of a dwelling is a

3    crime of violence.  No one doubts that there was a

4    conviction in that case and the conviction was for a

5    crime of violence.

6              THE COURT:  All right.  Well, I didn't address

7    that in preparation for today's hearing because I

8    thought that was all resolved.  Apparently it is not.

9    And I need to refresh my recollection about that.

10        If in fact he pled to Count 4, and if that is clear

11   from the records, and that was an attempted burglary of

12   a dwelling, there's no question that that is a crime of

13   violence, and that distinction between building versus a

14   dwelling becomes irrelevant.  So I need to take a look

15   at that.

16        But before I do that, the other issue outstanding

17   is the four-level increase for possession of these

18   firearms in connection with another offense.  And that

19   is, what evidence do you have to suggest that he

20   committed these home invasions or burglaries prior to

21   his taking possession of these firearms?

22             MS. NOLAN:  Well -- and I did argue this at

23   the last hearing, and I remember, I didn't think it was

24   going in my favor, but I --

25             THE COURT:  It wasn't.

1        MS. NOLAN:  Yeah, I can --

2        THE COURT:  My guess is it probably is not as

3    well here.

4        MS. NOLAN:  I am happy to recap in summary

5    what I would argue; is that he passed through Addison

6    County at the time.  He was in Poultney the night

7    before, stole a car in Poultney from a young woman,

8    passed through Addison County on his way up to

9    Chittenden County where he was stopped for DWI, and

10   that's when those guns went missing.

11       I would argue that the evidence supports a

12   preponderance of the evidence finding that he was

13   somehow involved in the theft of the guns because of

14   his -- because of the timing, because he in fact had

15   them and sold them to the gun stores, and because of his

16   flight from law enforcement, which I think evidences a

17   consciousness of guilt.  So that would be the

18   government's argument, in summary.

19       THE COURT:  Of course he has a pattern of

20   flying from -- fleeing from law enforcement --

21       MS. NOLAN:  That's true.

22       THE COURT:  -- on a number of occasions, so --

23       MS. NOLAN:  That's true.

24       THE COURT:  And he is obviously on the verge

25   of being caught in possession of a firearm, and that may

1       very well suggest to him that he need flee.  So I am not

2       so sure that his flight is in any way relevant to his

3       commission of these burglaries, which is of course what

4       you have to show to get the four-level increase.

5           Is there anything that you want to add to that,

6       Mr. Barth?

7               MR. BARTH:  I don't, your Honor.  Unless the

8       Court has specific questions, I, in short, don't believe

9       the government has met its burden of proof on this

10      issue.  I will have additional comments regarding the --

11      what I would call the confusion over the sentencing

12      documents, but I certainly can wait until the Court has

13      refreshed its memory on that issue or --

14              THE COURT:  Okay.  Well, let me also deal with

15      your issue for request for a variance from the

16      guidelines.  You want to argue that at this point?

17              MR. BARTH:  Certainly, your Honor.  Of course,

18      when I made my request to the Court for specific

19      sentence, that was -- it was unclear at that time what

20      the Court was going to rule on my guidelines objections.

21      My guideline calculations, as you may remember, I

22      believe were 51 -- in the neighborhood of 51 to 63

23      months.  I do stand by the recommendation I made, which

24      would have been close to the high end of that guideline

25      range, which is 60 months.

1          THE COURT:  Yeah, you had recommended 60

2    months, and from that I concluded that you, in light of

3    the ruling setting the base offense level at 24 prior to

4    adjustment, that you were pursuing a 60-month sentence

5    which would require a variance.

6          MR. BARTH:  Yes, a very fair assumption on

7    your Honor's part.  I would first point out that 60

8    months, five years, is -- would be significantly longer

9    than any sentence he has had in the past.  My review of

10    the presentence report indicates that his longest

11    sentence to date was a 36 or three-month --

12    three-month -- three-year sentence.  Now he has had a

13    series of convictions, but as far as a single conviction

14    is concerned, this will likely -- assuming the Court

15    doesn't go below my recommendation, will easily surpass

16    his longest jail sentence previously.  So this --

17          THE COURT:  How long was he in Attica?

18          MR. BARTH:  I don't know exactly how long but

19    I can certainly ask him.

20          THE COURT:  Okay.

21          (Defense counsel and defendant confer

22    briefly.)

23          THE DEFENDANT:  Just in Attica itself?  For

24    all of that sentencing time.  Two years straight.  The

25    two years and --

1          MR. BARTH:  How long did you have?

2          THE DEFENDANT:  Attica itself?  About eight

3    months.

4          MR. BARTH:  I think the Court probably heard

5    his answers to the question.

6          THE COURT:  Right.

7          MR. BARTH:  So I guess that's the first point.

8    The second point is, I have great hope and I am

9    heartened by the prospect of Mr. Mead spending his time

10   in federal custody, that is, I think the programming

11   that will be available to him, programming that he has

12   not had in the past, will help him.

13       As I think has been pointed out in my sentencing

14   papers, a letter that I think Mr. Mead read to the Court

15   and probably in statements he will make to the Court

16   today, he's an alcoholic.  The vast majority, if not all

17   of his crimes, stem from binge drinking.  He drinks too

18   much, he cannot deal with the amount he drinks, and he

19   commits stupid -- makes stupid decisions which amount to

20   crimes.  And so, as I was saying, I think the federal

21   system will offer him an opportunity that he hasn't had

22   in the past through the state system.

23       I also take great heart in the fact --

24          THE COURT:  How is this particular offense, in

25   particular, the being in possession of firearms, related

1   to his drinking?

2           MR. BARTH:  Oh, well, your Honor, he -- I

3   think he was intoxicated at -- very intoxicated at the

4   time of his arrest.  Whatever he was doing with those

5   firearms -- it appears he was reselling them -- was done

6   while he was intoxicated.  I mean, we're assuming now

7   that he didn't break in and steal those firearms, but he

8   nonetheless was selling firearms in an intoxicated

9   state; one could -- in a car, that is alleged to be

10  stolen.  So, so I think his intox -- the fact that he

11  was inebriated had everything to do with that particular

12  chain of events which ultimately led to his arrest and

13  being before your Honor today.

14      I think it affects his decision making.  I think he

15  just makes very poor decisions.  I guess, if anything,

16  there's an argument that the -- the failure to register

17  is less related to drinking and it's something that took

18  place over a period of time, but I think it's also

19  interrelated.  When you are drinking that much, when you

20  are drinking that often, the circuits in your brain

21  start to -- to cross, and even when the -- the actual

22  buzz or inebriation wears off, you are not exactly

23  thinking clearly or making the best decisions.

24      Alcohol has the same effect, I think, as some drug.

25  When you have a long-term drug addict, even if they

1    detox and they go clean, it's a period of time, I would

2    say it varies from person to person, drug to drug,

3    before they're thinking straight again.  And, in fact,

4    Mr. Mead, while he has been in custody, my relationship

5    with him has evolved over time and I think as his head

6    grows clearer, as he spends longer in custody with a

7    sober mind, I think he has been thinking clear.  He has

8    had a more intelligent dialogue with me, and he's seen

9    things that I have shown him or spoken to him about and

10   understood them in a way that perhaps he didn't when I

11   first met him.

12        So, I would say his alcoholism is one of if not the

13   most important root causes of his criminal history.

14             THE COURT:  Well, I appreciate that, but then

15   I look at the pretrial conduct in the presentence

16   report, which reads in relevant part:  The Marshal

17   Service revealed Mr. Mead has been a very difficult

18   inmate to manage.  He regularly presents violent

19   tendencies and behavior, often combative, belligerent,

20   difficult to deal with when he perceives correctional

21   staff is fulfilling his needs *[sic]*.

22        That's not alcohol related.  That's, as described

23   later on, mental-health related; isn't it?

24             MR. BARTH:  Oh, I think so.  I think

25   absolutely.  Look, I think that the alcoholism, the

1     mental-health issues, go hand in hand.  We learn that

2     seeing more and more studies about how the two

3     exacerbate each other.  But I don't know that I would go

4     so far as to say as nothing to do with alcohol,

5     your Honor.  Again, I think a person gets into a way of

6     thinking, a pattern of thinking, they're -- the abuse

7     that they put their system through, and the culture with

8     which they have lived for however many years, it's hard

9     to shake.  And when you are in custody, I think it's

10     even harder to shake despite the fact that you aren't

11     consuming alcohol.

12       He hasn't consumed any alcohol since he has been in

13     custody.  I think he has probably had opportunities to,

14     but he hasn't.  There's been no allegation that he has

15     used alcohol.  And that's been -- and I would give him

16     credit for this, from the day one I met him, that was a

17     priority of his to --

18          THE COURT:  Where has he been housed?

19          MR. BARTH:  Well, he has been housed in a

20     number of different places.  Essex -- I'd say Essex was

21     the longest, which is in New York.  Strafford.  But he

22     has been bounced around quite a bit.  Of course he has

23     been in Northwest.

24          THE DEFENDANT:  Springfield, St. Johnsbury.

25          MR. BARTH:  Oh.

1              (Defense counsel and defendant confer

2      briefly.)

3              MR. BARTH:  So, as the Court may recognize, he

4      came here from a state incarceration, so he also

5      informed me that some time in St. Albans and

6      Springfield.

7              THE COURT:  Okay.

8              MR. BARTH:  He has been bounced around a

9      number of -- four, five different institutions,

10     your Honor.

11             THE COURT:  All right.

12             MR. BARTH:  This is a man who, you know, has

13     told me he loves construction, he loves building things,

14     he likes to see things grow, he likes to see the fruits

15     of his labor.  He is a man who is extremely well-read.

16     He is a religious man who studies religion.  He has read

17     the Bible.  He has read the Quran.  He has read the

18     Torah, the Old Testament and New Testament, and actually

19     through his study has converted to Judaism.  As the

20     Court may have learned, the prisons have been

21     accommodating his meal requirements, his observance of

22     the holidays, et cetera.

23         So, this is a person who's intelligent, has the

24     ability to be a hard worker, and I think all of those

25     things make sense for him and can be his as long as he

1    remains sober.  And so we are going to make requests for

2    designation from your Honor.  One of them will be to

3    send him to a facility that will be able to help him

4    with his mental health issues.  I would suggest

5    recommendation for Devens.  I understand he may not go

6    there, or he may not go there immediately, but I think

7    given counseling for his mental health issues is

8    important; but also, in the alternative, I would ask for

9    a drug treatment program, I think the 500-hour drug

10   treatment program to address his alcohol issues, his

11   alcoholism and his abuse of alcohol, to give him the

12   tools when he is out to succeed.

13        And, you know, the guideline numbers here are huge.

14   You know, the guideline we are dealing with, the gun

15   guideline, incorporates the career offender guidelines.

16   And, you know, once you have two crimes of violence, as

17   determined by the court, the sentencing court, your

18   guidelines go extremely high.  We are talking about the

19   difference here of -- if the Court had granted my

20   objections and my reading of the statutory rape, and if

21   the Court were to follow or agree with my argument

22   regarding the confusion regarding the burglary, we were

23   talking about a four-to-five-year sentence.  Instead, we

24   are talking about guideline ranges over 10 years.

25        I just think 10 years is too much.  I think five

1    years is a long time.  I think that that will give him

2    time to understand and reflect on his actions but also

3    give him time to address his mental health issues, to

4    address his alcoholism, and hopefully get some

5    additional vocational training.  And so I think that's

6    an appropriate sentence.

7              THE COURT:  Well, just to briefly respond --

8              MR. BARTH:  Sure.

9              THE COURT:  -- there's no question that

10   there's an increase to level 24 based upon the crimes of

11   violence, in particular, and the reason for that,

12   frankly, is that possession of guns for those who have

13   been convicted of crimes of violence is a more serious

14   offense.  It is not to the point of a career offender,

15   he would be obviously much higher, or armed career

16   criminal or anything else of that sort.  But there is a

17   particular purpose why level 24 is what it is.

18             MR. BARTH:  I don't know what he would be at

19   at career offender.  Certainly the Armed Career Criminal

20   Act would be much higher, at least -- even with the

21   worst or the -- if I were to lose all arguments and the

22   guidelines that applied as the probation officer

23   suggests, those are still less than 15 years.  Certainly

24   that was something we were hopeful to avoid, and we

25   have.  But I don't know about career offender because

1   that's tied to the statutory maximum, and both of these

2   crimes have limited statutory cap, I think 10 years on

3   both, if I remember correctly.

4           THE COURT:  It would be much higher, but

5   regardless.

6           MR. BARTH:  It would in any event.

7           THE COURT:  Does your client wish to address

8   the Court?

9           MR. BARTH:  He does, your Honor.  He has

10  written a letter which I think you --

11          THE COURT:  Okay.

12          THE DEFENDANT:  Your Honor, I'm sorry for

13  being here -- I'm sorry to have to be here today in

14  front of you for sentencing.  I know I have done many

15  things wrong, and I hope the future will be better.  I

16  understand that you have to sentence me today, and I

17  take full responsibility for all my actions that I have

18  done in the past.

19      Your Honor, alcohol has played a very bad part of

20  my decisions.  All my criminal history stems from

21  decisions I made while under the influence.  This

22  problem, alcohol, has ruined my life and others.  While

23  I know you are going to give me a lengthy prison

24  sentence, I know that I fully intend to better myself

25  and get control of my alcohol problem and emerge from

1    custody a better person and productive member of

2    society.

3        Your Honor, I have two very special -- I have two

4    very special people in my life who love me very much --

5            (Defense counsel and defendant confer

6    briefly.)

7            THE COURT:  If I recommend the 500-hour

8    program, you'd participate in it?

9            THE DEFENDANT:  Yes.

10           THE COURT:  And what do you hope to do when

11   you get out, Mr. Mead?  Where do we go from here because

12   you have got a history of confronting authority figures,

13   law enforcement.  Where do we go from here?

14           THE DEFENDANT:  I think my biggest problem is,

15   is that I always return to the same area, to the same

16   people, doing the same shit.

17           THE COURT:  You mean to Granville, New York

18   area or --

19           THE DEFENDANT:  Granville, Rutland, that area.

20   My children live overseas, so it's kind of hard for me

21   with my kids, so.

22           THE COURT:  Well, where would you want to go

23   if you were released?  When you are released?

24           THE DEFENDANT:  I think about going back to

25   Pennsylvania because it's a better area.  People don't

1  know me very well.  I could start over.  Plus, I mean --

2           THE COURT:  And what about mental health

3  treatment?  Do you want to get involved in mental health

4  treatment?

5           THE DEFENDANT:  Yes, that's what I have talked

6  to my attorney about.  I do want to get it.  I mean,

7  it's gotta be right.  I mean, lately I haven't been

8  getting in any trouble.  I have been trying to mellow

9  out, trying to do the right thing.

10     My problem, a lot, I guess, is that I don't respect

11  authority very much sometimes.  But that's from my --

12  from never getting a chance when I was a kid, you know.

13  I just want to start a foundation for my kids.

14           THE COURT:  The problem, Mr. Mead, in your

15  situation, that's self-defeating.  You don't listen to

16  authority figures, you are going to have an authority

17  figure when you are released.

18           THE DEFENDANT:  Yes.

19           THE COURT:  A probation officer.

20           THE DEFENDANT:  I understand.

21           THE COURT:  Or you are going to have law

22  enforcement contacts like all -- if you react in such a

23  way as to flee or to confront or to pose a danger to

24  those people who are authority figures in your life, the

25  person who ultimately loses most, assuming you get out

```
1    of the situation with no violence, is you.

2              THE DEFENDANT:  I understand that.  That's why

3    I was just saying that I have been trying to do better

4    by listening to the authorities and trying to cope with

5    my own problems without having to lash out at people,

6    and try to better myself so I don't have all these

7    issues all the time, because I know it's wrong.  I don't

8    want to be that way and I don't want my kids to see

9    that.  So I'm trying.

10              THE COURT:  All right.

11              MR. BARTH:  Your Honor, if I may briefly?

12              (Defense counsel and defendant confer

13    briefly.)

14              MR. BARTH:  Your Honor, if I may, I just want

15    to finish reading his letter to the Court.  It's very

16    short.

17              THE COURT:  Yes.

18              MR. BARTH:  Thank you.

19         He left off about, "Your Honor, I have two very

20    special people in my life who love me very much, my

21    children, age 11 and 10."  I believe they're actually

22    now age 12 and 11 since he wrote this prior to our first

23    hearing.

24         "They live in Australia and I write them regularly.

25    I am proud of them.  They are great in school and have
```

1    compassion for others.  I received a Christmas card from

2    my daughter this year, and she told me she was proud I

3    was her dad.  This meant everything to me.  Now I

4    realize how important they are and how much more I owe

5    them as a father.  I want to be better and will be for

6    myself and them.

7         "Your Honor, I have been studying religion quite a

8    bit.  Luke 6:37 says forgive and you will be forgiven.

9    Your Honor, it is my hope that the victims of my crimes

10   can some day forgive me.  Of course, I beg forgiveness

11   from you and my higher power."

12        THE COURT:  Okay.  All right.  Does the

13   government want to respond?

14        MS. NOLAN:  Yes, your Honor.

15        The government feels very strongly that this is a

16   guidelines case.  I know your Honor's probably not going

17   to find the guideline range to be as the government's

18   advocated, but wherever -- if you find it to be, as the

19   probation office finds it, we would ask strenuously,

20   strongly, for a guideline sentence.

21        This is not just a case where the defendant

22   purposefully concealed his whereabouts from the sex

23   offender registry, which is a serious crime.  While he

24   was purposefully hiding, he committed a series of

25   menacing crimes.  The June 2010 assault on the

1    girlfriend was just a vicious beating.  He beat her once
2    in a gazebo; then he took her for a walk and beat her
3    again and she ended up in the mud and she sustained some
4    pretty bad injuries.

5        And he didn't -- he served two months in jail for
6    that crime and didn't register afterwards.  And by the
7    way, not all of his crimes are connected to alcohol, but
8    I don't want to bog down on that too much.

9        Also while unregistered, he engaged in this very
10   dangerous DWI with guns involved, with a loaded revolver
11   shoved between the seats, fled law enforcement, and of
12   course all of this comes against a backdrop of 20 years,
13   20 years of consistently endangering the community.

14       There are two offenses involving sexual
15   exploitation of minors.  It's not alcohol that causes
16   people to exploit children, at least not in and of
17   itself.  It's something else.  And I think it's really
18   an antisocial personality that we are dealing with here
19   and I think the PSR supports that.

20       There are burglaries, two of them on his record.
21   The child exploitation offenses.  We see brutalization
22   of women.  There's really no other way to put it.  I
23   mean, he is leaving women bloodied.  We see three DWIs.
24   We're fortunate know one died in those incidents.  And
25   of course guns.  He has got five felonies before this.

1            And I do think your Honor has to seriously consider

2       the hostility and aggression toward authorities.  I

3       mean, spitting at officers and telling them they're

4       going to get AIDS, you know, running in this most recent

5       incident in the area of a daycare, fleeing from law

6       enforcement, the pretrial conduct while in jail, the

7       refusal to be fingerprinted during the June assault

8       arrest, this is just an extraordinarily dangerous

9       person, your Honor.

10           And the government is -- is urging you, in the

11      strongest terms, to please protect the public and please

12      impose a guideline sentence.

13               THE COURT:  All right.  All right.  I am going

14      to take this under advisement just -- this is only going

15      to be 10 minutes, so ask that he stay here.  Just going

16      to be a couple minutes, and I will be right back.

17      (Court was in recess at 3:10 p.m.)

18      (The following was held in open court at 3:15 p.m.)

19               THE COURT:  All right.  I have had a chance to

20      go back and take a look at the actual documents

21      themselves, and let me summarize it as follows:

22           The question is whether the burglary conviction was

23      a crime of violence.  First, as a threshold issue, if

24      the burglary conviction was of a dwelling, it clearly is

25      a crime of violence.  Four-count indictment rendered

1    against Mr. Mead.

2         The interesting thing is that on the first docket

3    sheet coming back to probation and to the parties,

4    there's a reference to an attempted burglary of a

5    dwelling, and then it's referred to as Count 2.  In

6    fact, Count 4 is the attempted burglary of the dwelling.

7    And then there is obviously a change indicating clearly

8    that he pled to Count 4, which is the attempted burglary

9    of a dwelling.

10        It's clear that the -- that the court made a

11   mistake when it referred to Count 2 because he actually

12   referred to it as an attempted burglary of a dwelling.

13   So that, you know, resolves the issue.  The Court

14   specifically finds that he was convicted of Count 4.

15        Now, the interesting question about the Taylor

16   analysis that the defense has raised is an interesting

17   one.  You -- Taylor suggests that there's certain

18   documents that courts can refer to in determining what

19   is a crime of violence and not a crime of violence, and

20   in this particular point -- case, there was a reference

21   to a presentence report which clearly indicated that he

22   pled to Count 4.

23        Here, this is not being relied upon when you go

24   back to the Taylor document, that's the presentence

25   report, not for the underlying facts.  It's just merely

1 to find out what the court did.  That's essentially it.

2  So the Supreme Court in Taylor basically said,

3 well, you can't go determine facts based upon reviewing

4 documents other than charging documents or the few

5 documents which are accepted.

6  This is not what is being done here.  It's merely

7 going back to the presentence report to determine what

8 in fact he pled guilty to.  And I don't think that the

9 Taylor analysis comes into play.  This is just a

10 guideline by which the parties can rely in determining

11 what he pled to, not what the underlying facts are.

12  So it's clear he pled -- in my mind, he pled to

13 Count 4, which is an attempted burglary of a dwelling;

14 that's a crime of violence.  But the Court is also now

15 aware of the United States versus Brown, which reside in

16 a -- in a -- just in a burglary of a building in New

17 York State.  The Second Circuit has said that based upon

18 the residual clause, that that is a crime of violence.

19 The Court will rely upon that as an alternative.  But

20 essentially it's an issue of -- it's not necessary

21 because the Court finds that the clear item that he pled

22 to is Count 4, and that is a crime of violence because

23 it's burglary into a dwelling.  So as a result, the

24 offense level of 24 will be applied.

25  You want to say something else?

1            MR. BARTH:  If I may, just to complete my

2    record?

3            THE COURT:  Yes.

4            MR. BARTH:  I understand the Court's ruling.

5    I would -- I would point out a couple of things.  First,

6    I don't understand, and it is unclear to counsel, how

7    you can -- I don't mean you, the Court, but the New York

8    courts have one document which shows he pleads to Count

9    2, and then when a discrepancy is brought to their

10   attention, there is another document --

11           THE COURT:  But just before you go beyond that

12   point, look at that document.

13           MR. BARTH:  Yes.

14           THE COURT:  You see where it says Count 2?

15           MR. BARTH:  Yes.

16           THE COURT:  How does it describe it?

17           MR. BARTH:  I'm sorry, which one are we

18   looking at?  The -- the initial one that --

19           THE COURT:  I assume that you are looking

20   at -- just start with the initial one.

21           MR. BARTH:  Okay.  Sure.

22           THE COURT:  Okay?

23           MR. BARTH:  Yep.

24           THE COURT:  You are looking at the item to

25   which he pled guilty.  It says Count 2.  Now, the one I

1    have looked at says right before that attempted burglary

2    of dwelling.

3                MR. BARTH:  Yep.

4                THE COURT:  Does it say that?

5                MR. BARTH:  ILL entry dwelling.  So I assume

6    that means illegal entry dwelling.

7                THE COURT:  Okay.

8                MR. BARTH:  Yes.

9                THE COURT:  That's Count 4.

10               MR. BARTH:  Correct.

11               THE COURT:  In the indictment, that's Count 4.

12   That's what he pled to.  They may have said 2 by

13   mistake, but that's what he pled to.

14               MR. BARTH:  Sure.  And when I say "sure," I am

15   disagreeing with the Court, but --

16               THE COURT:  Sure.

17               MR. BARTH:  -- I understand what you are

18   saying.

19               THE COURT:  That's okay.

20               MR. BARTH:  I would point out one other

21   discrepancy.  I am troubled by the fact that when --

22   when the discrepancy is pointed out to the Court, they

23   just issue a new uniform sentencing document, but even

24   in the -- in the so-called corrected version that the

25   government procured, it still said attempted burglary.

```
 1    And he didn't plead to -- I mean, there's no attempt in
 2    the indictment.
 3         You may remember our discussion last time that
 4    Ms. -- Assistant United States Attorney Nolan suggested,
 5    well, that's a lesser included, and of course it's not.
 6    Attempt is a specific intent crime which requires an
 7    overt acts -- an overt, which is a substantial step for
 8    completion of the underlying crime, or substantive
 9    crime.  And so I still remain confused about this,
10    your Honor.
11         Even if you read, you know, the so-called corrected
12    uniform sentence and commitment form, we are left with a
13    different crime than is found anywhere in the charging
14    document that the Court has before it.  And my point --
15    the government correctly cites Brown.  You know, I don't
16    agree with Brown for the same reasons that we have
17    argued about other -- you know.  But how do we know what
18    he pleaded guilty to with the documents that are before
19    the Court?
20         I understand the Court's ruling.  I don't want to
21    quibble.  I just want to perfect my record.
22              THE COURT:  Sure.  I appreciate that.  But of
23    course you acknowledge Brown.  You acknowledge the
24    Second Circuit issued an opinion --
25              MR. BARTH:  Yes.
```

1          THE COURT:  -- to which you do not agree,

2     but --

3          MR. BARTH:  Correct.

4          THE COURT:  -- it certainly would apply.  And

5     under Brown, it doesn't make any difference whether he

6     pled to Counts, 1, 2, 3 or 4; it's a crime of violence.

7          MR. BARTH:  Yes, and perhaps my point, which I

8     am not articulating well, is because we don't have a

9     single document, sentencing document matching up with

10    indictment, whether it's the original uniform sentencing

11    form that was given to the parties by the Court or the

12    corrected one, we don't know what he was convicted of,

13    what he pleaded guilty to.  We are assuming, we are

14    speculating, or at least the government is, and the

15    Court is holding, that it had to be one or the other:

16    burglary of a dwelling or burglary of some building and,

17    thus, it's a crime of violence under 4B1.2 any way you

18    slice it, in light of the Brown case and the residual

19    clause.

20         And my argument, perhaps subtle and certainly not

21    winning the day, but the point is how do we know with

22    the document, how can we be sure that this was what he

23    was convicted of.  How do we know it wasn't a larceny.

24         THE COURT:  That's discounting the impact of

25    the presentence report that was reviewed by the

1   probation officer, and if you read the Taylor opinion,

2   it tells the courts not to find out what the underlying

3   facts of a case are to make an assessment as to whether

4   they're crimes of violence.  That does not necessarily

5   suggest that you can't go to other documents like plea

6   agreements to try to figure out what did the person

7   plead to, what was he sentenced for.

8            MR. BARTH:  And I understand the distinction

9   the Court is making that Taylor is determining, once

10  we -- the second step of the Taylor analysis and the

11  categorical approach is looking at, you know, once we

12  know what statute he was convicted of, what crime within

13  that statute.  I don't necessarily read Taylor and its

14  progeny to suggest that what I am saying, figuring out

15  what he actually was convicted of, that we can then look

16  to anything, whether it be judicially noticeable

17  document or not.  And certainly a plea agreement is a

18  judicially noticeable document.  So I would have no

19  grounds to quibble with a plea agreement or a plea

20  colloquy or a plea transcript as long as it was clearly

21  authentic.  But that's not what we're dealing with.

22       I understand the Court's point.  I again don't want

23  to quibble with the Court.  I think I have laid my

24  record.

25            THE COURT:  Okay.

1          All right.  So I have reviewed, in detail, the

2     presentence report and the sentencing memoranda.  Mr.

3     Mead, I -- I am faced with a really difficult decision

4     because on the one hand you have a -- a history of

5     violence or using violence or threats of violence in the

6     face of authority or others that is shocking and

7     long-standing.  You have been in and out of courts for

8     years and years and years.  Frankly, that's a history

9     which would call for a sentence of a sufficient length

10    to incapacitate you so that you no longer create a risk

11    to the community.  And I think it certainly calls for --

12    for a guideline sentence.

13         I am also impressed, frankly, with your commitment

14    to the two children and your statement about mental

15    health and drugs.

16         Based upon your entire record, the Court feels that

17    the guideline range is the appropriate one.  I am going

18    to sentence you at the low end of the guidelines as

19    opposed to what I may have done before, with a whole

20    list of recommendations to the Bureau of Prisons as well

21    as treatment providers when you are released into the

22    community to make sure that when you come back, you have

23    got the support systems necessary to be able to make it

24    because the next time around for you obviously could

25    result in life sentences or certainly career offender.

1    So the Court is going to deny the request for a

2    non-guideline sentence, impose a guideline sentence, and

3    the Court finds as follows:

4    The offenses of violating the Sex Offender

5    Registration and Notification Act, in violation of 18

6    USC, section 2250, and possession of stolen firearms, in

7    violation of 18 USC, section 922(j) and 924(a)(2)

8    occurred from in or about the summer of 2010 through the

9    fall of 2010.  The guidelines apply.

10   The Counts 1 and 2 are grouped.

11   Actually, I don't think I officially denied the

12   government's request for the four-level increase at the

13   earlier hearing.  Perhaps I suggested to the

14   government -- obviously I must have -- that I was going

15   to rule against them.  I agree with the findings of the

16   probation office that there should not be a four-level

17   increase.  There's no real direct evidence to suggest

18   that he was involved in a burglary; just that he was in

19   possession of firearms within a relatively short time

20   frame.  And I also think that the penalties covered by

21   this particular sentence are sufficient -- sufficient to

22   meet the purposes of sentencing.

23   So Count 1, SORNA:  The guideline for this offense

24   is found in section 2A3.5.  Defendant is a -- was

25   required to register as a tier II sex offender.  Base

1   offense level 14.

2        Specific offense characteristics do not apply.

3   Guideline two of the guideline for this offense is found

4   in 2K2.1.  The defendant committed the instant offense

5   subsequent to sustaining at least two felony convictions

6   for crimes of violence.  Base offense level is 24.

7        The following specific offense characteristics

8   apply:  Because there were between eight and 24

9   firearms, there's a four level increase.  Two-level

10  increase for the possession of stolen firearms.  That's

11  a six-level increase.  The multiple count adjustment

12  under 3D1.1, one unit is assigned.  There's no further

13  adjustment to the offense level.  Adjusted offense level

14  is 30.

15       Three-level reduction for acceptance of

16  responsibility.

17       The defendant has 21 criminal history points,

18  resulting in a criminal history category of six.

19       The guideline imprisonment range is 130 to 162

20  months.

21       The authorized term of supervised release is five

22  years to life.  And probation is not authorized.

23       It is the sentence of the Court the defendant be

24  committed to the custody of the Federal Bureau of

25  Prisons for a term of 65 months on Count 1, 65 months on

1    Count 2, each count to run consecutively, for a total of
2    130 months, to be followed by a five-year term of
3    supervised release.
4        Conditions of supervised release are as follows:
5        The defendant shall not commit any crimes, federal,
6    state or local.
7        He should not possess any illegal controlled
8    substances.
9        He shall abide by the standard conditions of
10   supervision recommended by the Sentencing Commission.
11       He shall not possess a firearm or other dangerous
12   weapon.
13       He shall participate in a program approved by the
14   U.S. Probation Office for substance abuse, which program
15   may include testing to determine whether the defendant
16   has reverted to the use of drugs or alcohol.
17       The defendant shall contribute to the costs of
18   service rendered in an amount to be determined by the
19   probation officer based on ability to pay or the
20   availability of third-party payment.
21       He shall refrain from the use of alcohol and other
22   intoxicants during and after treatment.
23       He shall participate in a mental health program
24   approved by the U.S. Probation Office.
25       The defendant shall contribute to the costs of

1    services rendered in an amount to be determined by the

2    probation officer based on ability to pay or the

3    availability of third-party payment.

4        He shall refrain from any unlawful use of a

5    controlled substance and submit to a drug test within 15

6    days of release on supervised release and at least two

7    periodic drug tests thereafter for use of a controlled

8    substance.

9        He shall not possess images or videos depicting

10   sexually explicit conduct involving adults, child

11   pornography, or visual or text content involving minors

12   which has sexual, prurient or violent interests as an

13   inherent purpose.

14       He shall avoid and is prohibited from being in any

15   areas or locations where children are likely to

16   congregate such as schools, daycare facilities,

17   playgrounds, theme parks, arcades, recreational

18   facilities, or recreation parks unless prior approval

19   has been obtained by the probation office.

20       He shall register as a sex offender in any state

21   where the defendant resides, is employed, performs

22   volunteer service, carries on a vocation, or is a

23   student, as required by law.

24       He shall not associate or have any contact directly

25   or indirectly with persons under the age of 18 except in

1   the presence of a responsible adult who is aware of the

2   nature of the defendant's background or who has been

3   approved in advance by the probation officer.

4        He may not use sexually-oriented telephone numbers

5   or services.

6        He should submit his person and any property,

7   house, residence, vehicle, papers, computer or

8   electronic communications or data storage devices, or

9   media and effects to search at any time with or without

10  a warrant by any law enforcement or probation officer

11  with reasonable suspicion concerning a violation of a

12  condition of supervised release, probation or unlawful

13  conduct by the person, and by any probation officer in

14  the lawful discharge of the officer's supervision

15  functions.  Such searches may include the removal of

16  such items for the purpose of conducting a more thorough

17  inspection.  The defendant shall inform other residents

18  of this condition.  Failure to submit to a search may be

19  grounds for revocation.

20       He shall cooperate in the collection of DNA as

21  directed by the probation officer.

22       The guideline fine range is $12,500 to $500,000.

23  He has demonstrated an inability to pay a fine.  The

24  fine is waived.

25       Special assessment of $200 is ordered, due

1    immediately.

2         Now, the Court's going to recommend the following:

3         First, that this defendant participate in the

4    500-hour drug and alcohol rehabilitation program

5    sponsored by the Bureau of Prisons.  If he has not

6    successfully completed that program by the end of his --

7    well, if he has not successfully completed the program,

8    he should participate in the nonresidential drug and

9    alcohol rehabilitation program sponsored by the Bureau

10   of Prisons.  If he has not completed either of those

11   programs, then the Court recommends to the probation

12   officer when he is released that he participate in

13   intensive and, if necessary, residential drug and

14   alcohol treatment at the time of his release.

15        Second, the Court recommends to the Bureau of

16   Prisons that he participate in mental health counseling,

17   and the Court specifically finds that there's a mental

18   health component to the commission of these particular

19   crimes as well as his use of alcohol, and that unless

20   that concern is addressed by the Bureau of Prisons, he

21   could -- he could pose a risk to the community in the

22   future.  So, as a result, he needs to participate in

23   mental health counseling.

24        And, again, the recommendation is to the probation

25   office that -- that he participate in intensive mental

1    health treatment upon his release if he has not

2    successfully participated in mental health counseling in

3    the Bureau of Prisons.

4         Next, the Court specifically recommends that he be

5    designated to a facility, when he is close to release,

6    that provides mental health treatment; in particular,

7    the Court recommends that he go to FCI Devens, which has

8    mental health programs as part of their programming.

9         Next, when he is to be released to the community,

10   the Court at this point recommends that he go to a place

11   other than the New York/Vermont area.  The defendant has

12   expressed an interest and need to adjust to a new

13   community, and that should be planned for by the Bureau

14   of Prisons as he is to be released.

15        Both the defendant and the government may have the

16   right to appeal this sentence as set forth in Title 18

17   U.S. Code, section 3742.  If the defendant is unable to

18   pay the costs of an appeal, he has the right to apply

19   for leave to appeal *in forma pauperis* and request the

20   court to appoint counsel for him.  If the defendant so

21   requests, the clerk of court shall prepare and file

22   forthwith a notice of appeal on behalf of the defendant.

23   Notice of appeal by the defendant must be filed within

24   14 days of the date judgment is entered on the docket,

25   pursuant to Rule 4(b) of the Federal Rules of Appellate

1    Procedure.

2        All right.  Anything -- anything further from --

3            MS. NOLAN:  The government moves to dismiss

4    Count 3.

5            THE COURT:  That motion is granted.  Anything

6    further?

7            MR. BARTH:  Your Honor, if I may just say one

8    thing.  I know my client would be remiss if I forgot to

9    say this.  And I appreciate the Court's patience.

10       On October 28th, 2010, he was arrested for the

11   unlawful mischief and resisting arrest, which is

12   paragraph 67 in the presentence report.  My client has

13   pointed out to me, and I simply forgot to mention it to

14   the Court, that he was sentenced to four to five months

15   but had been in custody for much longer than that, and

16   essentially served nearly four months, about three and a

17   half months.  He had asked me to do this, and I forgot.

18   If the Court -- because I do not believe he is going to

19   get credit for it from the Bureau of Prisons, that the

20   Court credit him that three to four months that he

21   overstayed on the sentence prior to the plea deal struck

22   with the state.

23           THE COURT:  All right.  Well, let's go through

24   this once again because the Bureau of Prisons would, in

25   fact, give him credit for any time that he did not -- or

1    that he served in excess of what was required by the

2    state sentence.

3         So he is convicted of the DWI on 7/15/2011.  He's

4    arrested on October 28.  So he receives four to five

5    months concurrently.  Okay?

6              MR. BARTH:  Yes.

7              THE COURT:  He would be specifically entitled

8    to credit any time after the end of February of 2010.

9    What you are suggesting is the time between February of

10   2010 and July of 2011 he would receive no credit?

11             MR. BARTH:  Yes.  And the reason, I believe,

12   what I suspect happened here, your Honor, was they had

13   the case for this -- the Court may remember my math is

14   terrible, but ballparking it, about nine months, and

15   during that time there were plea negotiations.  And come

16   the nine-month mark, it appears he pled to a -- some

17   sort of lesser sentence, lesser crime that had a smaller

18   sentence and he got sentenced to four to five months,

19   which had come and gone.  He served already four months

20   longer than the max, five months.

21             THE COURT:  Right.  And so he is left with

22   four, five months of no credit for anything.

23             MR. BARTH:  Right, because --

24             THE COURT:  Okay.  I am going to make a

25   specific recommendation to the Bureau of Prisons that he

```
 1    receive credit from the date when his state sentence was
 2    completed, and my estimate would be that would begin in
 3    the beginning of March of 2011, because after that he is
 4    getting no credit for anything, and he should be getting
 5    credit toward the service of his federal sentence.  So I
 6    am going to make that specific recommendation.  If that
 7    is not complied with, then I bet you will let me know.
 8              MR. BARTH:  Well -- and I want to say thank
 9    you for hearing me out on that.
10              THE COURT:  Okay.  Anything else at this
11    point?
12              MS. NOLAN:  No, thank you, your Honor.
13              THE COURT:  You have no objection to that,
14    right?  He has got five months that nothing's happening.
15              MS. NOLAN:  He should get credit for all the
16    time he has served.
17              THE COURT:  Okay.
18              MR. BARTH:  Thank you.
19              THE COURT:  Thank you.
20              (Court was in recess at 3:38 p.m.)
21                        *** ** ***
22                  C E R T I F I C A T I O N
          I certify that the foregoing is a correct transcript from the
23    record of proceedings in the
      above-entitled matter.
24
25    January 14, 2013         _____
      Date                     Anne Nichols Pierce
```