UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
            V                *
                             *
TERRY VAN MEAD               * CRIMINAL FILE NO. 11-87




SENTENCING
Monday, June 11, 2012
Burlington, Vermont




BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        District Judge


APPEARANCES:

    CHRISTINA NOLAN, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    STEVEN L. BARTH, Assistant Federal Public Defender,
        Office of the Federal Public Defender, District
        of Vermont, 126 College Street, Suite 410,
        Burlington, Vermont; Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

```
1   MONDAY, JUNE 11, 2012

2   (The following was held in open court at 10:05 a.m.)

3              COURTROOM DEPUTY:  This is case number 11-87,

4   United States of America versus Terry Van Mead.  The

5   government is present through Assistant United States

6   Attorney Christina Nolan.  The defendant is present in

7   the courtroom with his attorney, Steven Barth.

8        The matter before the Court is sentencing.

9              THE COURT:  Okay.  Mr. Barth, have you

10  received a copy of the presentence report?

11             MR. BARTH:  I have, your Honor.

12             THE COURT:  And you have gone over that with

13  your client?

14             MR. BARTH:  I have, your Honor.

15             THE COURT:  And any factual mistakes in the

16  report?

17             MR. BARTH:  None that we have not addressed in

18  the drafting process, your Honor.

19             THE COURT:  Okay.  All right.  Mr. Van Mead,

20  have you read the report?

21             THE DEFENDANT:  Have I read it before?  Yeah,

22  I have read it.

23             THE COURT:  Have you gone over the report with

24  Mr. Barth?

25             THE DEFENDANT:  Yes, I have.
```

1          THE COURT:  Are there any factual mistakes in

2    the report?

3          THE DEFENDANT:  None that we haven't

4    addressed.

5          THE COURT:  Okay.  Have the government any

6    factual errors?

7          MS. NOLAN:  No, your Honor.

8          THE COURT:  All right.  I have read the

9    presentence report.  I have read the sentencing

10   memoranda of both the government and the defense.  There

11   are a number of guideline application issues.

12      Defense ready to proceed to address those guideline

13   application issues at this point?

14          MR. BARTH:  Your Honor, counsel is prepared to

15   proceed.  However, as I indicated in an e-mail to

16   you/Ms. Evelti, my client has a request to continue his

17   sentencing hearing.

18          THE COURT:  He has a request to continue the

19   sentencing hearing?

20          MR. BARTH:  This hearing, yes.

21          THE COURT:  Okay.  All right.  Mr. Van Mead,

22   do you want to let me know why you are wishing to

23   continue the hearing?  And what -- what you're seeking

24   at this point?

25          MR. BARTH:  Your Honor, I will address the

1  Court on behalf of my client.

2       My client is seeking a continuance because there

3  was an incident at the Essex County jail.  I do not know

4  if the Court has been made aware of this incident

5  through probation or not.  However, my client is

6  concerned that in the future, he may be charged with

7  that crime if it is deemed a crime by the powers that

8  be.  And he is concerned that if he is sentenced here

9  today, then some day down the road, perhaps the district

10  attorney's office for the Essex -- for Essex County or

11  perhaps the U.S. Attorney's Office in that district will

12  choose to charge him and he will get additional time in

13  custody.

14       He would have a preference to know whether he is

15  going to be charged prior to a sentencing hearing.

16            THE COURT:  Well, I don't know of the

17  incident, so tell me what this is about.

18            MR. BARTH:  There was, as I understand it, an

19  incident, an altercation at Essex County including my

20  client and possibly two correctional officers.

21            THE COURT:  And how long ago was this?

22            MR. BARTH:  It was about three and a half

23  weeks ago.

24            THE COURT:  Well, I -- I'm shocked at, you

25  know, what you are asking here.  I mean, who knows

1    when a -- that decision is going to be made.  And,

2    frankly, the sentence here I cannot imagine would have

3    impact one way or another over a decision to be made by

4    a state's attorney in New York State.

5         MR. BARTH:  And, your Honor, in the brief time

6    before court, I have addressed those issues with my

7    client.  There's been some inability to communicate that

8    prior to the sentencing hearing today.  So certainly

9    there's a statute of limitations which would apply and

10   give the state's attorney or district court a period of

11   years to charge the crime.  Certainly if it were a

12   federal matter, it would be a five-year, I believe,

13   statute of limitations, and I am guessing this Court is

14   not prepared to continue the sentencing for that.

15        THE COURT:  I mean, that's correct.  So what

16   does -- what does Mr. Van Mead wish to do at this point?

17   I am not going to continue the sentencing based upon the

18   possibility that there may be some assault charge filed

19   again him in New York State.  So tell me -- tell me how

20   he wishes to proceed at this point.

21        MR. BARTH:  He is only requesting a 30-day

22   continuance, your Honor.

23             (Defense counsel and defendant confer

24   briefly.)

25        MR. BARTH:  I think, your Honor, 30 days would

1    give him some opportunity to see if there was going to

2    be any charges brought against him, and the 30 days

3    would also give him an opportunity -- as I understand

4    it, they're working with him at Stafford where he is

5    currently residing to get his medications set correctly

6    such that -- such that he'd be in a calmer state of mind

7    and such instance would never happen again.

8        THE COURT:  Well, frankly, the other issues,

9    that may take a written opinion.  You have raised a

10   number of issues in regard to crimes of violence whether

11   to be applied to Mr. Van Mead, and my intention was to

12   go through the hearing, listen to argument of counsel,

13   and then make a determination as to whether in fact

14   there needs to be a written order assessing whether

15   either or both of the predicate offenses are violent

16   offenses, which then increase his offense level.

17       And my suggestion is that we go through the

18   arguments first, and then the Court can address that.

19   But you tell me, does he have some particular medication

20   problem that makes it difficult for him to be

21   cooperating at this point or not?

22       (Defense counsel and defendant confer

23   briefly.)

24       MR. BARTH:  Your Honor, I indicated a moment

25   ago that I had had some inability to communicate with my

1    client over the past two weeks.  If I may just have a

2    brief moment to explain something to him?

3                THE COURT:  Okay.

4                (Defense counsel and defendant confer

5    briefly.)

6                THE COURT:  All right.  Mr. Barth, do you want

7    some time to speak with him upstairs?  I am not about

8    ready to postpone this based upon the possibility of

9    some charge in New York State.  There are complicated

10   legal issues to be addressed in the sentencing.  My

11   expectation was to proceed to talk about those

12   particular issues because they go right to the heart of

13   the guidelines here.

14               MR. BARTH:  Yes.

15               THE COURT:  And if I could make a

16   determination from the bench, I would; then proceed to

17   sentencing.  If not, I would need some time to write an

18   opinion.  So, you tell -- maybe it would be best if you

19   meet with him upstairs and you tell me how he wishes to

20   proceed at this point.

21               MR. BARTH:  Very well.

22               THE COURT:  Because I -- if you have a lack of

23   communication with him, then is he seeking a new lawyer?

24   Is he not seeking a new lawyer?  What -- what is his

25   expectation at this point?

1          MR. BARTH:  As I had indicated, I'd expected

2    that he might seek a new lawyer, but having had 15

3    minutes to speak with him upstairs, I don't think that's

4    the case, your Honor.

5          THE COURT:  Okay.

6          MR. BARTH:  He's free to correct me,

7    your Honor, but based on my conversations with him, he

8    seems content with his defense team at this time.

9        If I might ask of the Court, is the Court, based on

10   the legal memoranda that have been filed by the parties,

11   leaning towards a written decision?  If it is, that

12   would suggest to me that sentencing would not take

13   place.  I can inform my client of that, and perhaps that

14   would make him feel more comfortable about the hearing

15   today.

16         THE COURT:  Am I leaning in that way?  I think

17   that those are significant issues.  In particular, I am

18   interested in the distinction between the New York State

19   statute and the Vermont statute, whether Begay would be

20   applied or how it would be applied, in particular in the

21   crime of violence.

22       And in regard to the other offense, my expectation

23   is that the government can prove that he pled to Count

24   4, which is a burglary of a dwelling, and there is no

25   confusion.  But I don't know that because I haven't

1    heard argument.

2          So, I don't know, frankly.  I just -- I came into

3    the courtroom with an open slate as to whether in fact

4    this would require a written order or not.  Then you

5    have raised constitutionality questions as well in your

6    memorandum.

7                MR. BARTH:  Yes.

8                THE COURT:  So usually when those kinds of

9    issues are presented, an opinion needs to be written,

10   but I want to hear arguments of counsel.

11         So do you want some time to speak with him?

12               MR. BARTH:  Yes, your Honor.

13               THE COURT:  We have a sentencing at 10:30, and

14   so this could be postponed till later in the morning.

15               MR. BARTH:  Very well.  Thank you.

16               THE COURT:  Okay.  Thank you.

17               MS. NOLAN:  Thank you.

18   (Court was in recess at 10:18 a.m.)

19   (The following was held in open court at 2:05 p.m.)

20               COURTROOM DEPUTY:  This is case number 11-87,

21   United States of America versus Terry Van Mead.  The

22   government is present through Assistant United States

23   Attorney Christina Nolan.  The defendant is present in

24   the courtroom with his attorney, Steven Barth.

25         The matter before the Court is a continuation of

1    the sentencing hearing.

2                THE COURT:  All right.  This is a continuation

3    of the hearing.  The Court's ready to hear argument in

4    regard to the crimes-of-violence issue which has been

5    raised by the defense.

6          You have had some time to talk to your client,

7    Mr. Barth?

8                MR. BARTH:  I have, your Honor.

9                THE COURT:  How do you wish to proceed at this

10   point?

11               MR. BARTH:  I am prepared to go forward with

12   argument, your Honor.

13               THE COURT:  Okay.

14               MR. BARTH:  And if I may, thank you, your

15   Honor, for indulging the defense, and I think it

16   definitely helped, and I had an extra opportunity to

17   speak to Mr. Mead.

18               THE COURT:  Okay.

19               MR. BARTH:  And for the Court's understanding

20   or information, "Van" is actually his middle name.  So

21   he is "Mr. Mead."

22               THE COURT:  Oh, all right.  Okay.

23               MR. BARTH:  Your Honor, I think I was fairly

24   detailed in my papers.  4B1.2, which carries the

25   definition of crime of violence, which is referenced by

1    2K2.1(a), I believe, expands upon the definition found

2    in 18 USC, section 924(e), which is the -- the

3    definition of violent felony under the Armed Career

4    Criminal Act.  And it did so really in one important

5    way.  It expanded the list, the enumerated -- list of

6    enumerated crimes.  It has burglary, arson, extortion,

7    crimes involving explosives, but it also has murder,

8    manslaughter, kidnapping, aggravated assault,

9    extortionate extension of credit.  And so there is an

10   increase in the number of crimes enumerated that make up

11   or that are considered crimes of violence under the

12   definitional section 4B1.2 in comparison to 924(e).

13       What I find notable is that this definitional

14   section of 4B1.2 does not include statutory rape, and I

15   have made a canon of statutory construction argument,

16   and I think what breathes life or strength into my

17   argument is in a cross-reference that I made, my own

18   cross-reference to 2L1.2, which is the guideline section

19   for illegal reentry after deportation, which also

20   carries its own definition of crime of violence.

21       Now, interestingly about 2L1.2, your Honor, is that

22   it also has an enumerated list of crimes that are crimes

23   of violence.  And it is identical in every respect to

24   that found in 4B1.2 with one exception:  It increases,

25   it broadens sex offenses.  Not only does it have

1  forcible sex offenses but it actually lists statutory

2  rape.

3       So what you have is two lists of crimes that make

4  up crimes of violence, one in 4B1.2 and one in 2L1.2.

5  One includes statutory rape, 2L1.2, and one does not,

6  4B1.2.  And of course that's what we're talking about.

7  We're talking about statutory rape.

8       The New York penal code, it's not called statutory

9  rape as your Honor is well aware, but it's a fairly

10  generic statutory rape statute.  Age of consent is 17,

11  so anybody who's 16 years, 364 days old, who has

12  intercourse with somebody 21 or older, is a victim, and

13  the person who's 21 years or older is a felon.

14           THE COURT:  At least -- you may not like the

15  fact that the Court is bound by Second Circuit

16  precedent, but, generally speaking, it is, and the Daye

17  case seems to suggest that statutory rape is in fact a

18  crime of violence, at least as it interpreted the

19  Vermont statute which sets the age at 16 or below.

20       What is it about the New York statute which is

21  sufficiently distinguishable from the Vermont statute to

22  suggest that I could distinguish this particular case

23  from Daye?  Because I am somewhat bound by Second

24  Circuit precedent.

25           MR. BARTH:  Not your Honor.

1          THE COURT:  Oh?

2          MR. BARTH:  Not your Honor.

3          THE COURT:  No?

4          MR. BARTH:  Let me clarify something.  I am

5    only upset about Second Circuit case law when it

6    disagrees with me.

7          THE COURT:  Oh, right.

8          MR. BARTH:  When it agrees with me, I'm

9    perfectly happy.

10          THE COURT:  Just fine.

11          MR. BARTH:  So, let me answer your question --

12          THE COURT:  But you have raised the Fourth

13    Circuit, the Seventh -- the Sixth Circuit, the Seventh

14    Circuit, the Ninth Circuit, the Eleventh Circuit, all of

15    which disagree with the Second Circuit.

16          MR. BARTH:  Yes.

17          THE COURT:  And some of those opinions have

18    suggested that the Second Circuit decision in Daye was

19    not rigorously explained.

20          MR. BARTH:  Right.  And as I will argue in a

21    minute, it wasn't faithful to the holding of Begay.  But

22    I want to make something clear.  An analysis of Daye and

23    the categorical analysis is important, and I will

24    explain to you why I think, as I did in my papers, that

25    this case is factually distinguishable from Daye.

1    However, I am making arguments here with regard

2    specifically to the guidelines, and my canon -- my

3    arguments revolve around canons of statutory

4    construction, including the one referenced in my paper,

5    which were not raised in Daye.

6        Daye was simply an analysis of the statute, the

7    Vermont statute, in light of the recent holding in

8    Begay.   And while I don't think they got it right, and

9    every other circuit who has looked at this issue agrees

10   with me and disagrees with the Second Circuit, I have

11   raised arguments that were not addressed in Daye, and

12   this is one --

13           THE COURT:  But isn't the language in 4B1.2 of

14   the guidelines taken directly from the armed career

15   criminal statute?

16           MR. BARTH:  The residual clause is.

17           THE COURT:  The residual clause of the armed

18   career criminal statute.

19           MR. BARTH:  Absolutely.

20           THE COURT:  So --

21           MR. BARTH:  That is absolutely correct.

22   And --

23           THE COURT:  -- when they made that

24   determination about what that crime of violence meant,

25   and the language is the same when you are looking at

1    4B1.2, well, you know, that's -- doesn't take a brain

2    scholar to -- brain scientist or a rocket scientist or a

3    scholar --

4              MR. BARTH:  None of which I have.

5              THE COURT:  -- to say it applies.

6              MR. BARTH:  None of which I have.

7              THE COURT:  Right.

8              MR. BARTH:  I can't deny obviously that the

9    residual clause language in 4B1.2 is identical to that

10   in 924(e), and I cannot deny Daye -- Daye's holding

11   rests on the residual clause.  However, my argument,

12   that was not considered in Daye.

13        I think Daye was an ACCA case.  I don't think it

14   was a career offender case, so I don't think 4B1.2

15   played a role, but -- I could be wrong about that.  But

16   we are talking about the definition in 4B.2, and that

17   residual clause, your Honor, only follows after a long

18   list of enumerated crimes, crimes that were not

19   considered in Begay and Daye, and one has to read that

20   residual clause with that enumerated list in mind.

21        There's another canon of statutory construction or

22   maximum construction, *noscitur a sociis*:  A thing is

23   defined in part by the terms associated with it.  And

24   Begay itself did that.  Begay itself did that.  Begay

25   took a look at the residual clause and said, well, not

1    only must we look at the degree of risk that a crime

2    must meet to meet the requirements of the residual

3    clause, we have to look at the kind of risk.  Is it

4    similar in kind to arson, burglary, extortion?

5        Well, the enumerated list of crimes in 4B1.2 is not

6    limited to arson, burglary, extortion, or crimes

7    involving explosives.  And, as we will talk about in a

8    moment, the Second Circuit, in my mind, is not faithful

9    to the holding of Begay in any event.  But I need to

10   make it clear that, yes, the resi- -- while the residual

11   clause is identical, the list of crimes is not, and Daye

12   did not consider my statutory construction argument with

13   regard to the drafting of this guideline and 2L1.2.

14       It's notable, your Honor, that 2K2.1 could have

15   very easily referenced not just 4B1.2; it could have

16   referenced 2L1.2 as well.  It's also notable, I believe

17   2L1.2 was amended in 2003 to include statutory rape as a

18   crime of violence.  And my recollection is they did that

19   because a series of, I believe, Fifth or Seventh Circuit

20   cases which hound -- held that statutory rape is not a

21   crime of violence under 2L1.2.

22       Well, now we have all these circuits -- you just

23   listed them -- that have found statutory rape is not a

24   crime of violence for ACCA purposes, and yet the

25   commission has yet to change, in light of those cases,

1    4B1.2's list to include statutory rape.  Because if it

2    wanted to, in light of the cases, it certainly could

3    have and it's chose not to.

4        So, in short, to answer your question, yes, you are

5    bound by Daye.  And yes, I have a reason why this is

6    factually distinct from Daye.  But there is an

7    additional legal argument that I am making here that was

8    not addressed in Daye.

9        I also -- and I will get, again, back -- I haven't

10   forgotten the Court's question about how is this

11   factually different from Daye, but I do want to address

12   some of the government's arguments in response to my

13   statutory construction argument.

14       And they -- they say, look -- at least one of their

15   arguments is, look, if -- if -- if the definitions in

16   2L1.2 and 4B1.2 weren't the same, you'd end up with

17   absurd results.  In other words, well, if statutory rape

18   is a crime of violence under the illegal reentry

19   guidelines, it must be under 4B1.2.

20       But that argument doesn't make sense and it doesn't

21   make sense for the following reason, one of -- one of

22   example:  2L1.2, if you are convicted of a crime of

23   violence, gives you a plus 16, whereas if you are

24   convicted of a crime of violence under 2K2.1, prior

25   crime of violence, then your base offense level goes

1    from a 14, if you are a prohibited person, to a 20.  And

2    then if you have a second offense for a crime of

3    violence, goes to 24.  I believe my numbers are correct

4    on that.

5        So they're -- they're -- the results were not meant

6    to be the same.  They were both looking at crimes of

7    violence but obviously 2L1.2 thought a prior crime of

8    violence warranted plus 16, whereas 2K2.1 only plus six,

9    and in the case of a second prior conviction, another

10   plus four.

11       The government also argues that my canons of

12   statutory construction argument is flawed because

13   this -- this 4B1.2 enumeration of crimes is simply

14   illustrative, not exclusionary.  And I would agree with

15   that.  I would agree it's illustrative.  Obviously

16   there's a residual clause there so the residual clause

17   is meant to capture some crimes not included in the list

18   of enumerated crimes.  So I don't disagree with that.

19       But -- but the fact that it's illustrative

20   strengthens my argument, *noscitur a sociis:*  You are

21   defined by the terms that you are associated with.  And

22   we are talking about crimes that carry a high degree of

23   risk, and as Begay said, and here we are at Begay now,

24   purpose, violence, and aggression.  And that's where

25   Daye got it wrong.

1          Begay was talking about DUIs, and it determined

2     that DUIs are a strict liability crime.  And it didn't

3     amount to the kind of crime that the enumerated crimes

4     did, i.e., it was not purposeful, violent, nor

5     aggressive.  Statutory rape is analytically in the

6     same -- same realm.

7          The Second Circuit in Daye said, well, you

8     choose -- you choose to have sex with a person.  That's

9     true, but that's not the malum of the crime.  Just like

10    in drinking and driving, you choose to drink, but that's

11    not the malum of the crime.

12              THE COURT:  Well, but that's not -- that's not

13    only what they found.  They said you choose to have sex,

14    and that's a voluntary act, but the -- the victim or the

15    sexual partner can't consent because the victim is 15 or

16    younger and, as a result, there is no such thing as

17    consent, which implies that there must be some level of

18    coercion if not violence.  That's what they found, did

19    they not, in Daye?

20              MR. BARTH:  Well, I guess -- I guess that that

21    was part of their holding so I can address that.  I

22    don't see the factual or legal significance or

23    difference between driving under the influence and

24    statutory rape.  A -- factually speaking, not legally, a

25    person one day away from their 17th birthday can consent

1    to have sex with a 21-year-old.

2         THE COURT:  Well, that's -- you may be closer

3    to -- I am not going to say you are correct, but closer

4    to correct when you are talking about somebody one day

5    away from a 17th birthday or one day away from the 18th

6    birthday, but that of course suggests that you may have

7    to go beyond -- for statutory rape, you may have to go

8    beyond the elements of the offense, the categorical

9    approach, to look -- and to use -- to use Shepard, I

10   understand you use Shepard, but to go beyond the

11   categorical approach to look at the charging documents

12   and the statements during the course of the sentencing,

13   statements of the court, to find out if in fact there's

14   a level of violence in that individual circumstance.

15        MR. BARTH:  And now what we are talking about

16   is the two-step analysis --

17        THE COURT:  Right.

18        MR. BARTH:  -- the modifying categorical

19   approach.

20        THE COURT:  That's right.

21        MR. BARTH:  But before we can employ a

22   modified categorical approach, we have to know, as the

23   Second Circuit has instructed us, whether this statute,

24   the New York statute, is divisible.  And the government

25   hasn't shown that to be divisible.  And, in fact, your

1       Honor, the Second Circuit has only found statutes

2       divisible where the offenses are listed in a different

3       subsection or comprise discrete elements of a

4       disjunctive list of a proscribed conduct.  That's not

5       the case here.  That isn't the case.  You don't have you

6       are guilty of statutory rape if A or B or C.

7            Now, the Second Circuit has left open the question

8       about whether there might be some other tests to

9       determine when a statute is divisible.

10            THE COURT:  All right.  So what you are saying

11       is that for this Court, the district court, to go beyond

12       the categorical approach, looking at the elements of the

13       offense, to actually sort of invading the fact-finding

14       process of -- regarding that particular offense, to be

15       able to do that you have to show that the crime itself

16       is divided into subsections, one of which involves

17       forcible sex, the other involves consensual sex,

18       something of that general approach?  That's --

19            MR. BARTH:  That's an exact example.

20            THE COURT:  That's the only time you can go

21       beyond a strict consideration of the elements of the

22       offense?  Because that's not consistent with what I

23       always thought.  I thought if the statute unto itself

24       creates a sufficient level of ambiguity to assess

25       whether a particular crime that was -- that was the

1   subject of the conviction was a violent crime, you --

2   all you needed was that level of ambiguity.  Then, you

3   could go to the charging documents and you could find

4   out whether in fact that person committed a forcible act

5   as opposed to one which was not.

6           MR. BARTH:  The answer to your question is

7   determined based on what circuit you are in.  The

8   argument I am making for this divisible statute with the

9   test I just read to you from a Second Circuit case is

10  the approach used in the First, Fourth, Fifth and Eighth

11  Circuits as of late 2011.  The Second and Eleventh

12  remain ambiguous about which approach they use, but they

13  have only used it in the circumstances that I read to

14  you, where you have -- and think of it this way,

15  your Honor:

16          You have a statute, and we have all seen lengthy

17  state court statutes where it's -- for instance, if

18  you -- you are guilty of burglary in the first degree if

19  you enter a dwelling with the intent to commit a crime

20  here, if you enter an outhouse, if you enter, you know,

21  a business, if you enter -- a vending machine like the

22  Massachusetts -- at least they used to have a vending

23  machine as one of their burglary statutes, that may all

24  be under one section.  It's divided up into four, five

25  distinct crimes.

1          The categorical analysis which moves on to the

2     second stage or modified approach where then you get

3     into what documents you can and can't use, I am arguing

4     to this Court, and certainly several circuits have

5     agreed with me, that you only move to that second stage

6     when you have multiple divisible proscribed acts,

7     different crimes laid out with their own elements, and

8     you are trying to determine which one the defendant was

9     actually convicted of.

10         That is, the second stage analysis isn't a back

11    door to look at what actually happened, you know,

12    whether or not the person actually beat somebody up

13    instead of, you know, was just a, you know --

14              THE COURT:  What you are suggesting is that

15    there may be four different kinds of proof, and the

16    second stage of the categorical analysis is to figure

17    out whether it's one, two, three or four.

18              MR. BARTH:  Of a statute.

19              THE COURT:  And the dwelling would be the

20    example.

21              MR. BARTH:  Exactly.

22              THE COURT:  So what you are suggesting is you

23    cannot go to the second stage in a situation in which

24    there is no subsections, but it's merely an ambiguous

25    statute as to whether it's violent or not, so that you

1    could figure out whether in fact it's a crime of

2    violence.

3             MR. BARTH:  Exactly.  Exactly.  I think -- I

4    think you understand my argument.

5         So, the government, since we have transitioned to

6    this -- to this part of the argument, the government has

7    suggested, or argued, I should say -- I haven't

8    suggested they have argued -- that because the

9    indictment in this case, this previous case, the

10   statutory rape case, included the age of my client, 30,

11   and the age of the victim, 15, that that takes it out of

12   sort of any possible argument that this isn't a crime of

13   violence because -- and I guess that's in response to my

14   answer to your question, how is this factually different

15   from Daye.

16        And it's factually different because the age of

17   consent is a year -- a year higher.  It's a year higher.

18   And that's important.  That is a significantly important

19   fact here that the difference is somebody who is 15 and

20   364 days versus somebody's 16 and 364 days.  And it's

21   made important because Daye was decided incorrectly.

22        And so this Court has seen every other circuit.  I

23   have listed all the circuits that have looked at this

24   issue and gone the opposite way from Daye, and I am not

25   suggesting that this Court should hold that Daye was --

1    was wrong.  Obviously it can't do that.  It can't hold a

2    contradiction in Daye.

3        However, what this Court can do is limit Daye,

4    narrow it to the precise findings and factual scenario.

5    And this case is different.  The age of the victim is a

6    year older.  And the fact that the factual -- the actual

7    facts of this case may be that my client was 30 and the

8    victim was 15 are neither here nor there because the

9    government hasn't shown that this is a divisible

10   statute.

11            THE COURT:  Of course the Second Circuit has

12   rejected that whole argument implicitly when they found

13   in Daye that that is -- that statutory rape is a crime

14   of violence.  They basically ignored that whole

15   divisible argument because they said in just applying

16   that first stage, the categorical approach, it's a crime

17   of violence.

18            MR. BARTH:  Absolutely.  The Second Circuit,

19   as I remember, in Daye, didn't -- didn't even do a

20   second stage analysis because it said this crime is

21   categorically a crime of violence.

22            THE COURT:  Right.  And you wouldn't have to

23   do a second stage if in fact you --

24            MR. BARTH:  Right.

25            THE COURT:  -- make that determination.  So I

1    have got a Second Circuit precedent which has already

2    made that determination.  The only way to distinguish

3    Daye, and that's all this Court has the power to do --

4              MR. BARTH:  Yes.

5              THE COURT:  -- is to say that there's a

6    difference between the New York statute and the Vermont

7    statute in terms of age.

8              MR. BARTH:  Which is important.  I mean,

9    that's very important.

10             THE COURT:  So does that mean this whole

11   analysis that you are talking about, this subsection

12   argument in the second part of the categorical approach,

13   I don't even have to deal with because the Second

14   Circuit has told me, don't deal with it?  It's not

15   particularly relevant because the first stage has

16   already been satisfied and this is a categorical -- this

17   a crime of violence.

18             MR. BARTH:  Remember, they only told you that

19   with regard to the Vermont statute, not with regard to

20   this New York statute, and there is a difference between

21   the two statutes.  Okay?

22             THE COURT:  Okay.

23             MR. BARTH:  So -- and so your Honor's asking

24   me, and putting my feet to the fire, as you should, you

25   know, why should -- why is Daye distinguishable?  Why

1    should I even consider the second stage analysis?

2        I am saying there is a significant difference,

3    particularly in light of the holding of Begay:

4    purposeful, violent and aggressive, where every other

5    circuit agrees with Mr. Mead's argument.

6        Making this factual difference in this New York

7    penal statute, the age of consent is a year older than

8    the one in Vermont, that allows this Court to find in

9    accord with every other circuit that's looked at this

10   issue that this particular New York penal statute is not

11   categorically a crime of violence.

12            THE COURT:  So when it goes up -- when it goes

13   up on appeal --

14            MR. BARTH:  She's not going to appeal.

15            THE COURT:  Oh, really?

16            MR. BARTH:  She's already told me.

17            THE COURT:  No, she's not?

18            MR. BARTH:  I am teasing.

19            THE COURT:  So if it goes up on appeal, you

20   have all of these circuits -- the Fourth, the Sixth, the

21   Seventh, the Ninth and the Eleventh -- all saying

22   statutory rape is not a crime of violence.  You have the

23   Second Circuit saying, oh, yes, it's a crime of violence

24   but only if the statutory maximum is for -- only if the

25   statute calls for 16 and below as opposed to 17 and

1    below.  So if it's 17 and below, well, that's really not

2    a crime of violence, but if it's 16 and a below, it's a

3    crime of violence.

4              MR. BARTH:  Yes.

5              THE COURT:  That's the fine-tuning distinction

6    that you would be asking me to arrive at.

7              MR. BARTH:  Yes, that is.  But don't forget,

8    your Honor, one, I don't -- I don't consider it fine

9    tuning.  What if it was 18?  What if it was 19?  I mean,

10   so these are years.  So years -- the years matter.  So I

11   don't -- I don't necessary -- even under Daye's

12   reasoning, you know, the -- so I don't know that it -- I

13   would -- I would agree with most of what your Honor has

14   said.  I would disagree with the characterization of it

15   as fine tune.  I would say tuning.

16             THE COURT:  Tuning.  Or someone might say

17   circumventing.

18             MR. BARTH:  I would never ask your Honor to

19   ever do that.

20             THE COURT:  All right.  Well, then what about

21   the second issue in regard to crime of violence, and

22   that's breaking into the dwelling?  Was he convicted of

23   that -- of the Count 4, breaking into the dwelling?  Or

24   was he convicted of one of the other nondwelling?

25             MR. BARTH:  I don't -- I don't know.  And, you

1   know, I made certain objections in -- in -- in -- and I

2   think Probation Officer Bendzunas was very faithful.   I

3   mean he, for the most part, put my objections in the

4   addendum word for word.  And at that time it appeared to

5   me that there was a question about whether Mr. Mead had

6   been convicted of a burglary of a building versus

7   burglary of a dwelling.  And the reasons are the

8   contradictions in the charging -- the amended indictment

9   and the -- what I would call the judgment; they called

10  it something else, but the uniform commitment order,

11  whatever they called it.  And there were several.

12       Then I learned, after my objections had been sent

13  to Mr. Bendzunas, from the Assistant U.S. Attorney that

14  she had another judgment and commitment form or uniform

15  commitment form, both of which, as I understand the one

16  I had, the one Mr. Bendzunas had, and I believe even the

17  government had -- previously had, were certified by the

18  clerk of the court, but apparently an agent for the

19  government went and got a second judgment and commitment

20  form.

21       Now, that only caused me more confusion because I

22  don't understand how you could have one judgment and

23  commitment form that says one thing and a second one

24  that says something else.

25            THE COURT:  Well, now there's also a copy of

1    the presentence report in that particular case, at least

2    this is my understanding --

3          MR. BARTH:  Yes.

4          THE COURT:  -- that Mr. Bendzunas got a copy

5    of the presentence report which clearly indicates that

6    Mr. Mead was convicted of burglary of a dwelling, Count

7    4.  References Count 4.  Have you seen that?

8          MR. BARTH:  I haven't seen the presentence

9    report.  I, of course, have read his addendum with what

10   he has put in it, and I would argue, first, as I do in

11   my papers, we can't -- we are trying to determine what

12   Mr. Mead was actually convicted of.  So what are we

13   doing here again?  We are doing a modified -- the second

14   stage of a modified categorical analysis.  What -- what

15   was he actually convicted of?

16         THE COURT:  Well, that's a different -- this

17   is a totally different area, though.  We are not looking

18   into crimes of violence.  We are looking at what was he

19   convicted of, and if in fact you look at the presentence

20   report, and the presentence report says he was convicted

21   of burglary of a dwelling, Count 4 of a four-count

22   indictment, the only count which dwelt with dwelling,

23   you know, that seems fairly definitive.

24         MR. BARTH:  So the Court -- the Court -- just

25   to complete the record, I would argue that the PSR is

1    a -- not a Shepard document that can be used.  Obviously

2    the Court thinks this is outside the ambit of Shepard in

3    the categorical analysis, so I will move on to my second

4    argument, which is neither the new judgment and

5    commitment form nor the presentence report clarifies.

6    It doesn't clarify enough to know what he was convicted

7    of.

8         Even in the government and the presentence report

9    quotes that I read in the addendum indicate he was

10    convicted of Count 4, but if you look at the judgment

11    and commitment form, including the government's -- the

12    one they found after -- after my objections to the

13    presentence report, which I believe are attached as an

14    exhibit to their sentencing memorandum, it includes

15    aiding and abetting.  It includes -- he was convicted of

16    an aiding and abetting offense, and it has an extra

17    statute number there, which I have to assume is the

18    aiding and abetting statute, and that's not what he was

19    charged with in Count 4.  He was charged with a

20    substantive crime.  And there's no mention of aiding and

21    abetting nor this extra statute which is referenced in

22    the judgment and commitment form.

23         THE COURT:  So in the new judgment and

24    commitment order from the government, the government's

25    produced, to 4, Count 4 --

1                MR. BARTH:  Yes.

2                THE COURT:  -- they reference aiding and

3      abetting, which was in fact never charged?

4                MR. BARTH:  Not according to the indictment.

5      So if you look at -- let me just make sure I have

6      theirs, which -- yes.  Their -- I believe which is

7      attached as document 33-5.  The government wants to

8      correct me on this, please do.  But I believe their new

9      uniform sentence and commitment form is attached as

10     33-5.

11         And here you will see, unlike 33-4, which I think

12     is the old uniform sentence and commitment order, it

13     says Count 4, which in fact was the count in the

14     indictment.  However, you also see that says ATT,

15     attempted burglary, illegal entry, dwelling, and then it

16     has penal law 110-140.25-02.  And the indictment, which

17     is the fourth count, only references 140.25, and it's a

18     substantive crime, not an inchoate crime, not an

19     attempt.  And so there's still confusion about what Mr.

20     Mead was convicted of.

21         And we get back to the idea, I don't understand how

22     you can have two court certified sentencing documents

23     which are materially different.

24                THE COURT:  Okay.

25                MR. BARTH:  So if -- if it was burglary of a

1    dwelling, then it's a crime of violence.  As the

2    government points out, if it's a burglary of any

3    building, under Second Circuit case law -- I believe the

4    case is Brown and I reference it in my sentencing

5    memorandum as well -- then it's still a crime of

6    violence.  However, I think we don't know exactly what

7    he was convicted of.  We don't know -- and it says

8    amended indictment.  So I'm just confused, your Honor.

9              THE COURT:  Okay.

10             MR. BARTH:  And the documents don't make it

11   clear to me what he was convicted of.  I had assumed it

12   was either burglary of a dwelling or burglary of a

13   building.  Now I am just not sure because we have two

14   different certified copies of a judgment and commitment

15   order, neither of which are faithful to the actual

16   charging document that I had, that the government still

17   has, and that the probation department has.

18             THE COURT:  All right.  Well --

19             MR. BARTH:  But, but, but the government's

20   right.

21             THE COURT:  I think you did talk about aiding

22   and abetting.  I am just putting together your argument.

23        I looked at the fourth count.  It clearly is a

24   substantive count.  It's not an attempted account --

25   count.

1          MR. BARTH:  Yes.

2          THE COURT:  It's did knowingly and unlawfully

3     enter the dwelling with the intent to commit a larceny.

4     And then looking at, I think, which is the most recent

5     judgment and commitment order, or uniform sentencing and

6     commitment, I guess they call it in New York State,

7     attempted burglary, illegal entry, dwell, four, I assume

8     that that's what is meant by the -- the area -- that's

9     the count he was convicted of.

10          MR. BARTH:  Yes.  That was an issue I raised

11    with regard to the initial document which, I believe, is

12    33-4 and which the probation department and I both had,

13    but it remains an issue in the government's newly-found

14    uniform sentencing and commitment order document.

15          THE COURT:  Okay.  All right?  Well, let me

16    get the government's response to --

17          MR. BARTH:  Very well.

18          THE COURT:  -- these issues.

19          MR. BARTH:  And, of course, your Honor, very

20    briefly, I raised this in my papers to preserve for

21    appellate review, but --

22          THE COURT:  Justice Scalia's dissent.

23          MR. BARTH:  Yes.  Both -- both the attempted

24    burglary, according to the probation officer, and the

25    statutory rape require, rest upon, in the probation

```
 1        officer's analysis as well as the government's, the
 2        residual clause, and my argument mimics, mirrors, echoes
 3        Justice Scalia's, that this is --
 4                  THE COURT:  On -- for vagueness.
 5                  MR. BARTH:  Yes.
 6                  THE COURT:  Right.
 7                  MR. BARTH:  Correct.
 8                  THE COURT:  Okay.
 9                  MR. BARTH:  Thank you, your Honor.
10                  THE COURT:  All right?
11                  MS. NOLAN:  Thank you, your Honor.
12            On the attempted burglary issue, I don't see any
13        confusion here.  The statute that's referenced in both
14        of the conviction records is 140.25, subsection two,
15        which subsection -- it's subsection two that's the
16        additional thing being referenced.  I don't know if
17        Mr. Barth is confusing that with aiding and abetting,
18        but the New York statute, the way it's written, it's
19        subsection two of 140.25 that makes it a crime to break
20        into a dwelling.  So that's what that two is.
21                  THE COURT:  Okay.  But where is the attempted?
22                  MS. NOLAN:  Well, your Honor, as you well
23        know, attempt is always a lesser included offense when
24        you charge a substantive count.  I think the only thing
25        we can conclude from this is that he pled to attempt
```

1    which would be subsumed within the substantive charge.

2              THE COURT:  Attempt is a lesser included

3    offense?

4              MS. NOLAN:  Of any count.

5              THE COURT:  I am not sure that that's right.

6    I mean, in a lot of offenses -- attempt requires

7    specific intent.  It's specific intent not just when you

8    are in the place to steal, but it's specific intent to

9    commit that particular offense.  That's an added element

10   to the substantive offense of burglary of a dwelling

11   house.

12       So, I never knew attempted was a lesser included

13   offense.  Now, that doesn't mean that he didn't plead to

14   attempted burglary of a dwelling, but it's not charged

15   here.  How does it get, fourth count, from a substantive

16   offense to what appears to be attempted burglary?

17             MS. NOLAN:  It would seem to me that if he

18   committed -- if you charged him with actually committing

19   the burglary of the dwelling, then you have also charged

20   him with attempting to do it.  And it appears -- I mean,

21   both of the conviction records say that it's --

22             THE COURT:  Logically, that's correct, from --

23   I shouldn't say colloquial, but you understand attempt,

24   when you attempt to do something, you have the specific

25   intent to actually commit the particular crime, so you

```
1   have to actually show and prove specific intent to
2   commit that particular offense, which is an element
3   which is not included in the substantive offense.
4        That means, because you have an additional element,
5   it's not a lesser included offense.  It has to be
6   specifically charged and then substantiated, but --
7                MS. NOLAN:  And --
8                THE COURT:  Regardless.
9                MS. NOLAN:  And fair enough.  And there's no
10  doubt that there's an ATT, attempted, you know, before
11  the burglary, when it lists in these conviction records
12  the charge that he pled to.  Of course, attempted
13  burglary of a dwelling is a crime of violence.  That's
14  pretty well settled.  The guidelines says it; the
15  Supreme Court has said it.  So I don't think it matters
16  too much how he got there.  It's pretty clear what he
17  was convicted of.
18                THE COURT:  Yeah, but his argument, I think,
19  is that one of the first three counts may have included
20  that attempt; in particular, Count 2 I think is what was
21  referenced before.  And does that suggest that they're
22  really confused about which offense he pled to?  Anyway.
23  No, I --
24                MS. NOLAN:  If he pled to any of these
25  offenses, or attempting them, that would all be -- they
```

1    would all be crimes of violence under Second Circuit

2    case law, under Supreme Court case law.  The Second

3    Circuit has decided that burglary of a building, this

4    very statute that he might have been convicted of, if

5    there was a mistake, is a crime of violence.  So any

6    of one of those--

7              THE COURT:  Oh, wait a second.  Then I am

8    really confused.  I thought the distinction was

9    dwelling, has to be of a dwelling to actually constitute

10   a crime of violence.  A burglary of an outbuilding is

11   not a crime of violence.

12             MS. NOLAN:  Your Honor, United States versus

13   Brown, unless I am reading it correctly, which is always

14   possible, held that violation of the New York burglary

15   in the third degree statute, which is what's charged in

16   Counts 1 through 3, is a crime of violence for purposes

17   of the guideline enhancement.  And the reason that Brown

18   held that is because burglary of a building had already

19   been ruled a crime of violence by the Second Circuit

20   under the Armed Career Criminal Act and because the

21   circuit has pretty consistently -- well, very

22   consistently said that you -- you apply them the same

23   way.

24             THE COURT:  Okay.

25             MS. NOLAN:  They mean the same thing.

1          THE COURT:  All right.  So I will have to look

2    at the Brown decision, because if they actually take

3    that provision, which does not refer to dwelling, and

4    say that a burglary of an outbuilding or burglary of a

5    nondwelling is a crime of violence, that would be

6    extraordinarily unique.

7          The Sentencing Commission, from day one, at least

8    day one as long as I have been on it, always referred to

9    a burglary of a building which was not a dwelling as not

10   a crime of violence.

11         So what you are suggesting is the Brown case, at

12   least in its application of that particular statute,

13   goes a different way?

14         MS. NOLAN:  And it's -- yes.  And it's

15   interpreting --

16         THE COURT:  Okay.

17         MS. NOLAN:  -- 4B1.2, which is the enhancement

18   that's at issue in this case and the provision of the

19   guidelines application in this case.

20         THE COURT:  Okay.  And how about the statutory

21   rape?

22         MS. NOLAN:  Your Honor, the government doesn't

23   see any way out of the Daye holding.  Daye held that

24   statutory rape is a crime of violence or a violent

25   felony, they held specifically, under the Armed Career

1    Criminal Act, because of the inherent susceptibility of

2    minors to the use of force and coercion by adults into

3    sexual acts.

4         It's -- it held that -- it said that the test was

5    that that -- that the crime, the statutory rape, had to

6    typically -- a typical instance of it involved a risk of

7    coercion, use of force.  It doesn't have to be every

8    single time; that's not the test.  But the typical

9    statutory rape case will involve a risk of violence, use

10   of force, aggression.  That is at least as palpable or

11   as strong a risk or high a risk as you would have in a

12   burglary case.

13        In fact, the Second Circuit in Daye said, We think

14   the risk is probably even higher in statutory rape cases

15   than in burglary cases.  So extrapolating that out to

16   the New York statute, there doesn't seem to be any

17   meaningful difference between the statutes.

18             THE COURT:  Well, is the fact that the New

19   York statute says 17 or below as opposed to 16 -- does

20   that make a difference?

21             MS. NOLAN:  I can't imagine why it would

22   because Daye said that the risk is that you're engaging

23   in sexual acts, specific kinds of sexual acts, and they

24   are more involved sexual acts.  This is not, you know,

25   kissing or just touching each other.  But that you are

1    doing it with somebody who is deemed unable to consent.

2        In Vermont, you are deemed unable to consent when

3    you are under 16.  In New York, you are deemed unable to

4    consent when you are under 17.  To the extent

5    your Honor's concerned about that difference, the New

6    York statute actually had an age disparity requirement.

7    So, to the extent your Honor thinks that it wouldn't

8    be -- the risk wouldn't be present for a 16-year-old but

9    it would be for a 15-year-old, which is what I take

10   defense's argument to be, well, the Vermont statute had

11   no minimum requirement for the minimum age of the

12   perpetrator, whereas the New York statute, even though

13   the age of consent is a little higher, they have a

14   four-year requirement.

15       So I think that that -- the requirement that there

16   would have had to have been an age disparity may -- can

17   give the Court comfort that it was the type of crime

18   that would always involve a risk of aggression or

19   violence or force.

20           THE COURT:  All right.  Now, you have also

21   objected to the presentence report because there's not a

22   recommendation of a four-level increase for possession

23   of a firearm in connection with another offense, and I

24   assume that you are talking about the burglary.

25           MS. NOLAN:  The burglary of the homes.

1          THE COURT:  Okay.  So how -- the state never

2      charged him with burglary.  How do you -- how do you get

3      the Court to essentially calculate or arrive at a

4      conclusion that he was the one who broke into those two

5      houses to steal the 15 guns?

6          MS. NOLAN:  I don't think the Court need --

7      need conclude -- well, first of all, the standard is

8      different.  I am not suggesting we could prove it beyond

9      a reasonable doubt but by a preponderance of the

10     evidence that he was involved in some way in those

11     burglaries.

12         The best evidence I can point to is that his

13     presence down near Rutland in the morning, and in

14     Chittenden County, in Williston, that afternoon, has him

15     passing through Addison County at right -- roughly the

16     times that the burglaries were reported.  So I think

17     that's a piece of circumstantial evidence.

18         And then how he reacted when -- well, first he went

19     and sold the guns as quickly as he could, which shows

20     consciousness of guilt and, secondly, he fled from law

21     enforcement, which is also an indicator of a guilty

22     mind, of somebody who is showing guilt for something,

23     namely the burglary -- the burglary in Addison County.

24         I mean, how did those guns get to him literally

25     within an hour or two of the burglary?

1          THE COURT:  Well, to what extent are you

2     speculating as to whether or not he broke in or not or

3     bought it from somebody on the way through or whatever?

4          MS. NOLAN:  I would -- I am suggesting that

5     the evidence is strong enough to infer that he possessed

6     them in connection with being -- with having some

7     involvement in the burglary.

8          THE COURT:  It is fair to say that the state's

9     attorney chose not to charge him with the burglaries,

10    just the possession of stolen property; is that correct?

11         MS. NOLAN:  Yes.  They charged him with DWI,

12    resisting arrest.  I don't -- I am not sure if there was

13    a stole -- I think the stolen property has been our

14    bailiwick.  But -- but, yes, that is true.

15         THE COURT:  Okay.

16         MS. NOLAN:  Your Honor, I just wanted to say

17    one other thing about this divisible argument, which I

18    heard for the first time today.

19      I was just looking at the Walker case, United

20    States versus Walker, which is 595 F. Third 441, and

21    that's a case in which the Second Circuit used the

22    modified categorical approach to determine whether a

23    prior conviction would -- would constitute a crime of

24    violence for purposes of the firearm enhancement for

25    2K2.1.  And it used the modified categorical approach,

1    and what it did was what I have always thought you were

2    supposed to do, was determine whether the prior

3    offense -- whether it could have involved conduct that

4    was both a crime of violence and was not a crime of

5    violence.  And if you decide that it could be both, then

6    you go to the next step.

7              THE COURT:  Okay.  But does that ambiguity,

8    whether it's a crime of violence or not, have to be set

9    forth in subsections of a particular statute?  Or can

10   you just look to the statute, say this is ambiguous as

11   to whether it may be a crime of violence or may not, and

12   therefore I can go to the modified categorical approach?

13             MS. NOLAN:  Every case that I have read, I

14   have not seen anything about how -- that the ambiguity

15   has to be set forth in the statute.  It -- to me, the

16   cases that I have always read, is the statute he is

17   convicted under, if it covers conduct that both is a

18   crime of violence and is not a crime of violence, then

19   you go to the modified -- then you go to the Shepard

20   documents, and this case is an example of where they did

21   that.

22             THE COURT:  Okay.  The Walker case involved

23   what state and what statute?

24             MS. NOLAN:  Well, South -- well it was South

25   Carolina, strong-armed robbery.

1            THE COURT:  Okay.  And does that particular

2    section -- that particular statute have a number of

3    subsections --

4            MS. NOLAN:  No.

5            THE COURT:  -- some of which are violent, some

6    of which aren't?

7            MS. NOLAN:  No.  I guess what I am trying to

8    say is I'm just not -- I feel like I have read a number

9    of the cases on this point lately, on this issue, and I

10   have not seen a case that draws that distinction in the

11   Second Circuit or, frankly, not in the Supreme Court

12   cases I cited that -- that describe how to do the

13   modified categorical analysis if you get past the

14   categorical analysis.

15           THE COURT:  Okay.  Okay.

16           MS. NOLAN:  Does your Honor -- and I just

17   would like to say for 3553(a) factors --

18           THE COURT:  I think this is a really

19   significant legal issue, and based upon the argument,

20   I'd like to address -- I'd like to write something on

21   this.  It's fair to say that the definition of crimes of

22   violence is inconsistent; it's all over the place.  The

23   Sentencing Commission has been dealing with this for

24   years and years and nobody has been able to come to a

25   general consensus.

1       How it's handled, in particular, the 2L1.2 cases,

2   is extremely important.  And this is important for the

3   Second Circuit.  I would be interested to research --

4   research the law, so it means a postponement of the

5   ultimate sentencing.  And then once that's resolved, I

6   can write something on that, and then we will come back

7   for sentencing and then you can address the 3553(a)

8   issues because you will know exactly where you start at

9   this point.

10          MS. NOLAN:  Understood.

11          THE COURT:  Okay?

12          MR. BARTH:  If I may have a brief response,

13   your Honor?

14          THE COURT:  Yes.

15          MR. BARTH:  First, the government cites U.S. V

16   Brown.  I also cite it in my papers, and I understand

17   their -- their reading of the case to be correct,

18   that is, under the residual clause, the Second Circuit

19   has interpreted burglary of any building to be a crime

20   of violence, even though under 4B1.2 it only says -- it

21   narrows it to burglary of a dwelling.  And I initially

22   raised this issue, despite the fact that any of those

23   counts include burglary, because I thought it notable,

24   noteworthy, important to preserve that issue because,

25   look, the Sentencing Commission has spoken, burglary of

1    a dwelling, and yet here the Second Circuit, to borrow a

2    phrase, has circumvented the commission's list by

3    saying, well, the residual clause sucks up any burglary

4    of any thing any time.

5         However, my argument now is slightly more broad

6    than that, more than just preserving the issue of

7    whether the Second Circuit got it right in Brown when it

8    said burglary of any building is a crime of violence.

9    Now, I am actually and honestly confused about what he

10   was convicted of, whether -- because we have, yes, an

11   indictment that has four different burglaries, but the

12   conviction documents, and we have two of them now, don't

13   match up to those four counts.  So we don't know that he

14   was actually convicted of any of the counts in that

15   indictment.

16        THE COURT:  But if all four of the counts

17   constitute crimes of violence, doesn't it become just an

18   academic question as to which one he pled to?

19        MR. BARTH:  No, because we don't know that he

20   pled to that particular charging document.  Remember,

21   that document says amended.  And the uniform sentencing

22   documents, both of them, don't match up with that --

23   with that -- that indictment.  So for all we know, all

24   the documents are wrong.  The indictment may not be the

25   right indictment.  After all, if I went to the clerk's

1  office tomorrow, maybe they'd give me a new indictment

2  certified by the clerk.

3      So I think it's more than just me preserving this

4  issue to challenge Brown at the Second Circuit level.

5  This is really, we don't know what he was convicted of.

6          THE COURT:  When was the Brown decision?

7          MR. BARTH:  I'm -- you know, it's in my

8  memorandum.  I --

9          THE COURT:  Is it post-2008, post-Begay?

10          MS. NOLAN:  December 30th, 2008.

11          THE COURT:  December 30th of 2008?

12          MS. NOLAN:  Yes, your Honor.

13          MR. BARTH:  So -- so I believe the

14  government's reading of U.S. V Brown is an accurate one.

15  I just -- I wanted to make clear why I am raising this

16  issue, and it's because there is a real confusion about

17  what he was convicted of.

18      The government says that this type of crime --

19  talking about the statutory rape now -- is one that

20  typically involves risk, that is, one where you have

21  somebody -- somebody that is under the age of 17 and

22  somebody 21 or older who that person's having

23  intercourse with.  And that is -- that is just not --

24  simply not been shown.  I mean, I don't believe that

25  this is purposeful, aggressive or violent, but the

1     government relies on this.  Is it typically something

2     that would put a person at the same level of risk and

3     qualitatively the same kind of risk?  And they say yes,

4     because 21 and 16, 21 and 15, 28 --

5          In Chambers, the Supreme Court endorsed the idea

6     of -- at the trial level, and even on appellate level,

7     bringing statistics in to show that this actually is a

8     type of case that involves that type of qualitative and

9     degree of risk.  And the government simply hasn't done

10    that.  We haven't seen any type of statistical analysis.

11         THE COURT:  Well, maybe the reason they didn't

12    do that is because the Second Circuit has already done

13    it for them.

14         MR. BARTH:  No question.  No question.

15         THE COURT:  The Second Circuit has already

16    said that that's already -- that's already established

17    and satisfied, so, why would they necessarily have to go

18    through all of the evidentiary burden of trying to show,

19    you know, whether there's a degree of risk in these

20    kinds of offenses?

21         MR. BARTH:  And I think you're right.  I think

22    the government is resting on Daye.  But again, I

23    think -- and I won't rehash this -- that Daye is

24    factually distinguishable, and that we have statutory

25    construction arguments that -- that rely on the

1    guidelines themselves and the differences in the

2    guidelines that support our arguments.

3         With regard to -- and I am just going in order of

4    the government's comments.  With regard to whether these

5    guns were involved in other felony offense, we stand on

6    the arguments of probation, and we believe that in order

7    for this Court to find differently, it would have to

8    engage in speculation.  And so we agree with probation

9    on that.

10        And, finally, with regard to the question of

11   divisibility, I read the Court a quote earlier and I

12   will just give the Court a citation, which is a Second

13   Circuit case, and it's -- the case name is U.S. versus

14   Lanferman, and that's L-A-N-F-E-R-M-A-N.  This was an

15   immigration case that employed the categorical analysis.

16   And in it they say, We, quote, have explicitly found

17   statutes divisible only where the removable and

18   nonremovable offenses -- they're talking about

19   whether -- whether something's removable as an

20   aggravated felony or not because it's an immigration

21   case -- they describe, are listed in different

22   subsections or comprise discrete elements of a

23   disjunctive list or proscribed conduct.

24        And so that -- that type of divisibility analysis

25   has only been -- is the only one that's been used by the

1    Second Circuit.  Now, the Second Circuit has remained

2    quiet or silent on whether any of the other types of

3    analyses that could render a statute divisible can be

4    employed, but up till now they have only used the one I

5    just read to you, or at least as of Lanferman.

6         Now, if we were in the Ninth Circuit, be a

7    different story.  Then the government's analysis would

8    be correct, at least to a degree, but we're not.  I

9    cited a number of circuits that agree with my

10   divisibility argument, using this sort of analysis that

11   I just read, and I got that from a late 2011 case, Ninth

12   Circuit, en banc.  I don't have the cite but it's

13   Aguila-Montes de Oca, which did sort of a quick circuit

14   survey on who's using this divisible-only type of

15   analysis and who is using the broader analysis that the

16   government employs and who has remained silent or

17   ambiguous on the issue.  The Second and the Eleventh

18   were the two circuits that remained silent or ambiguous.

19            THE COURT:  All right.  Well, this is an issue

20   that I think I need to address, so it means we can't go

21   forward with the completion of the sentencing today.  I

22   will issue a written opinion, and we will reschedule the

23   sentencing for a time after the opinion comes out.

24   Okay.

25            MR. BARTH:  At that time I assume my client

1    will have an opportunity to allocute?

2                    THE COURT:  Oh, yes.

3                    MR. BARTH:  Thank you, your Honor.

4                    THE COURT:  Right.  Okay.  Thank you.

5                    MS. NOLAN:  Thank you.

6                (Court was in recess at 3:00 p.m.)

7                        *** ** ***

8

9

10

11

12                C E R T I F I C A T I O N

13        I certify that the foregoing is a correct
     transcript from the record of proceedings in the
14   above-entitled matter.

15

     January 14, 2013          _____
16   Date                      Anne Nichols Pierce

17

18

19

20

21

22

23

24

25