```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                      DISTRICT OF VERMONT



UNITED STATES OF AMERICA,  )
              Plaintiff,   )      Case No:
                           )      2:11-cr-00087-wks-1
       vs.                 )
TERRY VAN MEAD,            )
              Defendant.   )



                         RESENTENCING
                   Monday, May 11, 2015
                   Burlington, Vermont



BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS, III
    District Judge

APPEARANCES:

    TIMOTHY C. DOHERTY, ESQ., U.S. ATTORNEY'S OFFICE
         11 Elmwood Avenue, 3d Floor, P.O. Box 570
         Burlington, VT  05401

    STEVEN L. BARTH, ESQ., FEDERAL PUBLIC DEFENDER'S
         OFFICE, 126 College Street, Suite 410
         Burlington, VT  05401


    Probation Officer:  John P. Bendzunas
    Deputy Clerk:  Joanne Muir
    Court Reporter:  Kim U. Sears, RPR


              CAPITOL COURT REPORTERS, INC.
                     P.O. BOX 329
              BURLINGTON, VERMONT  05402-0329
                   (802/800) 863-6067
           E-MAIL:  info@capitolcourtreporters.com
```

2

1   MONDAY, MAY 11, 2015

2    (The following was held in open court at 11:05 a.m.)

3                    THE COURT:  Good morning.

4                    MR. DOHERTY:  Good morning.

5                    MR. BARTH:  Good morning.

6                    DEPUTY CLERK:  This is case number 11-87,

7    United States of America vs. Terry Mead.  The Government

8    is present through Assistant United States Attorney Tim

9    Doherty.  The Defendant is present via video conferencing.

10   Present in the courtroom on behalf of the Defendant is

11   Assistant Federal Public Defender Steven Barth.

12                   The matter before the court is

13   resentencing.

14                   THE COURT:  All right.  This is a

15   resentencing.  Mr. Mead, can you hear us today?

16                   MR. MEAD:  Yes, I can, Your Honor.

17                   THE COURT:  Okay.  I have before me a

18   request for permission to participate in the hearing via

19   video conference and a waiver of your right to be present.

20   Have you had an opportunity to go over that request with

21   Mr. Barth?

22                   MR. MEAD:  Yes, I have.

23                   THE COURT:  And this is your signature here

24   on the form?

25                   MR. MEAD:  Yes, it is, sir.  Yes.

3

1          THE COURT:  And you wish to proceed to your

2     sentencing via video conference?

3          MR. MEAD:  Yes, Your Honor.

4          THE COURT:  Have you had an adequate

5     opportunity to talk to Mr. Barth in advance of the

6     hearing?

7          MR. MEAD:  Yes, we have.

8          THE COURT:  Okay.  All right.  The court

9     will grant your request for permission to participate in

10    the hearing via video conferencing.

11         Again, I've read the presentence report,

12    read the same sentencing report that was submitted

13    initially.  You have received a copy of that report, Mr.

14    Barth?

15         MR. BARTH:  The initial one?

16         THE COURT:  Initial.

17         MR. BARTH:  Oh absolutely, yes.

18         THE COURT:  And you have gone over that

19    with your client?

20         MR. BARTH:  Yes, Your Honor.

21         THE COURT:  Any factual mistakes in the

22    report?

23         MR. BARTH:  No, Your Honor.

24         THE COURT:  Other than obviously the

25    calculation is different based upon the second circuit's

4

1    opinion on *United States vs. Day*.

2                    MR. BARTH:  Yes.

3                    THE COURT:  That one?  All right.  Mr.

4    Mead, have you gone over the report again with Mr. Barth?

5                    MR. MEAD:  Yes, we have.

6                    THE COURT:  Did you see any mistakes in the

7    report?

8                    MR. MEAD:  We discussed the facts and

9    things there, and I didn't see any mistakes.  No.

10                   THE COURT:  Okay.  And Mr. Doherty, any

11   errors?

12                   MR. DOHERTY:  No, Your Honor.

13                   THE COURT:  All right.  Again I've read the

14   report.  I've read the sentencing memoranda submitted by

15   the defense.  I went over the various exhibits that were

16   attached to the report including the 18-page summary of

17   Mr. Mead's adjustment at Petersburg.  And so the defense's

18   request is for a non-guideline sentence, and I'll hear you

19   on that request.

20                   MR. BARTH:  Yes.  Thank you, Your Honor.

21   When I stood before this court with Mr. Mead next to me,

22   and this court imposed sentence, I recall very clearly as

23   the court regularly does, it gave some advice to Mr. Mead

24   to change his life.  It was not unlike advice that counsel

25   had tried to impart both before and after sentencing.  And

5

1    one hopes that a client, a Defendant, standing before the

2    court will listen and take those things to heart and make

3    an attempt to change his or her life.

4            And so often we don't know because the

5    Defendant, the client, never ends up before the same court

6    again.  Often it's the opposite; client or Defendant ends

7    up before the court.  However, in this case because of the

8    second circuit's opinion in *U.S. v. Mead* we do know that

9    Mr. Mead took this court's words to heart, took counsel's

10   advice to heart, and most importantly made a decision on

11   his own to change his life.

12           Now one thing that Mr. Mead has wanted me

13   to communicate to both the probation officer, to this

14   court, and I'm sure based on the court's comments at the

15   beginning of this hearing it would know this, neither

16   counsel nor Mr. Mead had any expectation that this case

17   would necessarily come back before the court.  I felt

18   strongly that our argument was persuasive based on the --

19   going back and reading the court's opinion on this, I

20   think the court may have even thought the argument was

21   somewhat persuasive, although maybe I'm reading too much

22   into it.  But there was Day.  And Day was binding on this

23   court obviously.  The court had seemingly very little

24   leeway to get around Day.

25           And what's interesting about Mead is that I

6

1    believe it was Judge Livingston who authored the opinion

2    in Mead who also authored the opinion in Day.  Seemingly

3    one might argue doing a bit of pivot.  The reason I bring

4    this up is Mr. Mead's concern that this court, the

5    probation officer and counsel might believe he sustained

6    this good behavior for these years simply thinking that

7    this case would come back.  And certainly I never imparted

8    that belief in him, and he never believed that.  I can

9    tell you he was extremely surprised when I spoke to him

10   after the decision was made.

11              Despite not believing that he would ever be

12   before this court again awaiting sentencing, Mr. Mead has

13   had a sea change in both his -- in his behavior and his

14   attitude.  I want to stress to you that shortly after the

15   Day case was -- I'm sorry, after the Mead case was

16   published, I got a call from Petersburg.  There were two

17   COs on the phone.  They were concerned because they now

18   had a presentencing detainee in general population at an

19   FCI.  And they were concerned that they had to put Mr.

20   Mead into segregation for liability purposes.

21              Now I've never heard of this before, but

22   they wanted to talk through with me.  I told them, of

23   course, they had no liability issues, and they should not

24   put him in segregation, and ultimately that's the choice

25   they made.  But this was the first indication that I had

7

that there had been a dramatic change in Mr. Mead's
attitude.  Because both of those correctional officers had
nothing but nice things to say about Mr. Mead.  I think I
would have been hard pressed to find similar comments from
correctional officers and U.S. Marshals pretrial.  And
what they said was that at that time he was the orderly in
the associate warden's office.  That is a privilege only
given to one inmate after that inmate has proven
themselves, and if they continue to prove themselves, they
do not rotate any other inmates through that job because
it is such a sensitive job.  They want to keep somebody
there that they trust.  And Mr. Mead has maintained their
trust and remains in the associate warden's office as the
orderly.

In addition to earning the trust through
his hard work and remaining free from infraction, he's
taken serious steps to better his life by taking advantage
of the programming that is available to him at Petersburg.
I've attached several certificates to show the court that
he has done his best to improve himself both physically,
mentally and emotionally.

But in addition to that, Your Honor, Mr.
Mead has been proactive in looking forward beyond the
walls of the Petersburg facility.  As the court has seen,
Mr. Mead has taken steps to regain the trust of his

8

1    family, and regain the trust of some of the folks in the

2    community.

3                    THE COURT:  Well there was -- there are a

4    couple of different documents that were somewhat

5    inconsistent about whether in fact he has made progress at

6    reuniting with the family.  First, there is a reference in

7    one particular page to him having a whole lot more contact

8    with his children.

9                    MR. BARTH:  Yes.

10                   THE COURT:  And then there is another page

11   which is -- I think it's even following, which suggests

12   that he's still having difficulty reuniting with the

13   family, but he's making efforts.  What is the level of his

14   communication with the kids, and in particular his

15   reintegration with the family or plans for reintegration

16   with the family?

17                   MR. BARTH:  Yes.  So as far as giving you

18   with what regularity Mr. Mead is in contact with his

19   children, I can't tell you.  But we have spoken about this

20   recently.  We spoke about it even just before the court

21   took the bench.

22                   Your Honor, I think he's made great

23   strides.  I think from -- the impression I have from Mr.

24   Mead is that he has regular contact with his children now,

25   that it has been a process, but that he is in regular

1   contact with his children.  He just mentioned, I think for

2   the first time this morning, that he also has reconnected

3   with the mother of his children, and if I'm wrong about

4   where I've misinterpreted something he's told me, I'm sure

5   he will correct me when he has a chance to speak to Your

6   Honor.  But he has made great strides in reconnecting with

7   his children.

8            I can tell you, Your Honor, that even

9   before he was sent to FCI Petersburg one of the most

10  important things to Mr. Mead was his children.  I'm sure

11  Mr. Mead remembers this, but he had his family send us,

12  and we collected, I think, from some of the things that

13  were in his property that was seized, a number of

14  pictures.  And some of it, if I may is -- my memory is

15  coming back to me, was sent to us or we picked up when he

16  was transferred from facility to facility.

17           The most important thing that -- to Mr.

18  Mead that he wanted to make sure we got back to him were

19  the pictures and letters of his children and from his

20  children.  So that has been a constant motivator in Mr.

21  Mead's life, but it appears and certainly he can address

22  this, that he has earned their trust and is in regular

23  contact in particular with his children.

24           In that report I would note, I think it is

25  somewhat -- it's somewhat dated, I think they do them

1  every six months or so.  In any event, I think there's

2  been great strides in that regard.  I also attached a

3  letter from Ms. Long, Mr. Cresinger.  He, Mr. Mead, has

4  taken steps not only to better himself while he's in

5  custody, but to make sure that he has a secure place to

6  land once he's released.  He's going to have a place to

7  stay, and he is going to have a job.  Those things have

8  been promised to him by Ms. Long and Mr. Cresinger and

9  that is what Mr. Mead plans to do.

10            I also understand that -- from Ms. Long

11  that there are some plans to help Mr. Mead get into school

12  so that he is in school part time while he's working as

13  well.  And I mentioned this in my paperwork, but Mr. Mead

14  has been saving his money.  At the time I talked to him

15  about that last he had saved up about $6,400 in his

16  account.  He now has $6,700 in his account.  So he's done

17  everything one could hope that a person in his position

18  would do such that the court can be reasonably assured he

19  won't be committing new crimes and facing new sentencing

20  in the future.

21            For those reasons, and pursuant to the

22  Supreme Court's holding in Pepper, we think that the court

23  should take those things into consideration and vary

24  downward from the guidelines from a low-end sentence of 92

25  months to a relatively modest variation to 75 months.

1                 THE COURT:  All right.  Do you wish to say

2    anything, Mr. Mead?

3                 MR. MEAD:  Your Honor, can you hear me?

4                 THE COURT:  Yes.

5                 MR. MEAD:  The only thing I wanted to say

6    was Mr. Barth is correct.  I did take the words to heart.

7    I didn't have any plans on the deal going through because

8    I didn't plan -- I mean I did most of it for myself and my

9    kids to make sure when I am released that I will be

10   financially secure, I'll have better life for my kids.

11   Right now I'm just E-mailing them letters, and also I

12   established like Mr. Barth said, guarantee of employment

13   and housing from the people that can help me, and they are

14   supporting me a hundred percent no matter when I'm

15   released so this way I can be a productive member of

16   society.

17                And he also told you that I worked for the

18   associate warden which is directly working in the warden's

19   office as an orderly.  I also work on the compound for the

20   captain.  I have had no infractions.  I've stayed shute

21   free this whole time I have been in Petersburg.  I

22   realized I was a mess and I just knew that I couldn't do

23   it anymore.

24                THE COURT:  So what was it that turned this

25   around here, Mr. Mead?  Because when you were in court

1    here you, to say the least, were a mess.

2              MR. MEAD:  Yes.  I understand that.  And to

3    be honest, I think what it is, both my kids were -- before

4    they were younger kids.  Now they are turned to teenagers

5    I'm realizing how much I missed.

6              THE COURT:  What kind of contact do you

7    have with them?

8              MR. MEAD:  Right now it's through E-mail

9    with their mom.  I have both their Email addresses and

10   letters.  I have a few hundred pictures that they sent me.

11   I send them pictures back and forth.  I try to get them

12   gifts, they do drawings and stuff for me on the holidays.

13   The phone is kind of difficult because they are 16 hours

14   ahead of us right now.  But either my mom -- I have

15   contact with my mother now.  She moved back to Vermont.

16   And she knows I'm here, and she is doing her best.

17              So I figured if I fail -- I get paid from

18   the social work, I get paid $96.  I put 90 dollars in my

19   savings and $6 on my account so I can contact my children.

20   I don't spend my money.  I save that because I know when I

21   get out I don't want to be dependent on society.  I want

22   to be self dependent and be able to help my children

23   wherever I can, whenever I can because they have helped

24   me.  Trying to do something good.

25              THE COURT:  All right.  So your plans -- I

1  mean I read the letter about the employment that's been

2  offered to you.  And they obviously are going to provide

3  housing.  That is your plan when you're released?

4          MR. MEAD:  My plan is to, yes, work for Amy

5  and Toby, and they have like 50 houses, apartments.  I'm

6  going to live in one of their apartments.  Eventually I'm

7  going to take over their detailing company.  They have a

8  detailing company also.  And we are going to build houses

9  for them.  They build a lot of houses which I like to do.

10 And keep moving.

11         THE COURT:  So I noticed that you couldn't

12 get in the 500-hour program so -- within three years of

13 your release date.  Is the 500-hour program available at

14 Petersburg?

15         MR. MEAD:  Yes, there is one.  I did do a

16 short one originally.

17         THE COURT:  Right.  I saw that.

18         MR. MEAD:  Right.  They were waiting close

19 to my release because when you sentenced me you said close

20 to my release to do the program.  And I believe it wasn't

21 until 2012, so we were working on it before the case

22 manager changed.

23         THE COURT:  All right.  All right.  Okay.

24 Is there anything else that you want to say?

25         MR. MEAD:  Yes.  I just want to apologize

1    for the way I acted before.  That whole thing -- just in

2    the fact that I've changed considerably from what I was

3    before, in my opinion, from my attorney's opinion, just in

4    the fact that shows that I did it because I knew I needed

5    to.

6                    THE COURT:  Okay.  All right.  Mr. Doherty,

7    do you want to respond?

8                    MR. DOHERTY:  Your Honor, when Ms. Nolan

9    filed her sentencing memo back in 2012 she went through

10   the 3553(a) factors and argued those factors militated in

11   favor of 130 months' sentence.  In the government's view

12   those factors are still in play.  They still militate in

13   favor of a guideline sentence in this case.

14                   Mr. Van Mead has 21 criminal history

15   points.  He has a long track record of violence, brutal

16   violence, in some instances predatory behavior toward

17   women, young women frequently.  In the Government's view

18   at this point the defense is asking for the court to

19   essentially come close anyway to cutting his previously

20   imposed sentence in half.

21                   The Government just does not think it's

22   warranted.  So we submit that a guideline sentence

23   somewhere within that 92 to 115-month range is appropriate

24   under the 3553(a) factors.

25                   THE COURT:  Okay.  Any response, Mr. Barth?

1            MR. BARTH:  No.  Thank you, Your Honor.

2            THE COURT:  All right.  So going back to

3    the sentencing date, Mr. Mead, there are a number of

4    reasons why the court imposed a guideline sentence.  There

5    was a request for a non-guideline sentence.  And generally

6    the court's practice is first to assess where the

7    guidelines fall.  What's the sentence required by the

8    guidelines or suggested by the guidelines, and then makes

9    a separate analysis as to whether or not a non-guideline

10   sentence would be more appropriate.

11           So when I did that, I made an analysis that

12   based upon who was before me at that particular moment a

13   sentence of 130 months was relevant.  So it was

14   appropriate.  It was not greater than necessary to

15   accomplish the purposes in sentencing.

16           So when one comes back for resentencing,

17   one doesn't necessarily go to the bottom line of the

18   guidelines when one imposed the guideline sentence

19   initially.  At the point at which you were in this

20   courtroom that sentence I felt appropriate.

21           Now, of course, four points have been

22   reduced from the guideline range.  But more than that,

23   you've made what appears to be a significant change in

24   your life.  And what's interesting about that fact is that

25   you made it without necessarily knowing that you would be

16

1    back before the court.  You know, maybe a light went off,

2    maybe you came to a recognition that you should be a

3    father again, maybe you came to a recognition that it's

4    time to decide not to spend the rest of your life in

5    prison.  Regardless, I went through your records, clearly

6    you've made adjustment.  And the court is going to make

7    not only a sentence toward -- below the bottom of the

8    guidelines, but a mild variance.  One of the things that I

9    think is really important is that you participate in the

10   500-hour program so that you learn the skills to be able

11   to adjust to pressures in life without returning to drugs

12   when you're released to the community.

13              And as a result, the court is going to

14   impose a sentence of 84 months which is below the

15   guideline range.  And I do that because it means that

16   you've got plenty of time to prepare for your release, it

17   means that you can get into the 500-hour program, although

18   I doubt very much you would get credit for that, but that

19   you could begin to plan for your reentry.

20              At the same time, this was an

21   extraordinarily serious offense.  You were found in

22   possession of guns or having sold guns that had been

23   stolen from two different residences just that morning.

24   And with your criminal history of 21 points in possession

25   and then distributing guns, that's just an extraordinarily

1    serious offense.  So the court is -- based upon really

2    what you've earned from your behavior at Petersburg --

3    going to make that adjustment below the guideline range,

4    modest though it is, but with the idea that you begin the

5    process of planning your reentry.

6                     So the court finds as follows:  The offense

7    of violating the Sex Offender Registration and

8    Notification Act in violation of 18 USC section 2250 and

9    possession of stolen firearms in violation of 18 USC

10   section 922(j), 924(a)(2), occurred from in or about

11   December of 2010 to the fall of 2010.  The guidelines

12   apply.  Are you standing -- oh, you're standing for a

13   reason?

14                     MR. BARTH:  He can't stand because he'll be

15   off the screen.

16                     THE COURT:  So you're going to stand.

17   Okay.  Counts I and II of the indictment do not meet the

18   grouping criteria and thus will be considered separately.

19   Count I, this is the SORNA offense.  The guideline for

20   this offense is found in section 2A3.5.  The Defendant was

21   required to register as a tier-two sex offender.  Base

22   offense level is 14.  Specific offense characteristics do

23   not apply.

24                     Count II, possession of stolen firearms.

25   The guideline for this offense is found in 2K2.1.  The

1    Defendant committed the instant offense subsequent to

2    sustaining at least one felony conviction for a crime of

3    violence which results in a base offense level of 20.

4    Specific events characteristics apply.  There is a six

5    level adjustment, four levels based upon the number of

6    firearms, 8 to 24.  And two levels for the fact that the

7    firearms were stolen.  So the adjusted offense level is

8    26.

9              Pursuant to multiple count adjustments one

10   unit is assigned.  The combined adjusted offense level

11   remains at 26.  The Defendant has demonstrated acceptance

12   of responsibility.  Three level reduction to 23.  The

13   Defendant has a total of 21 criminal history points

14   resulting in a criminal history category of six, and the

15   guideline range is 92 to 115 months.

16             Authorized term of supervised release is

17   five years to life.  The court grants the Defendant's

18   request for a non-guideline sentence, adjusts the sentence

19   to 84 months.

20             It is the sentence of the court that

21   Defendant be committed to the custody of the federal

22   Bureau of Prisons for 42 months on Count I and 42 months

23   on Count II, each to be run consecutively for a total of

24   84 months to be followed by a five-year term of supervised

25   release.  Conditions of supervised release are as follows:

1   The Defendant shall not commit any crimes; federal, state

2   or local.  The Defendant shall not possess any illegal or

3   controlled substances.  The Defendant shall abide by the

4   standard conditions of supervision recommended by the

5   sentencing commission.  He shall not possess a firearm or

6   other dangerous weapon.  The Defendant shall participate

7   in a program approved by the U.S. Probation Office for

8   substance abuse, which program may include testing to

9   determine whether the Defendant has reverted to the use of

10  drugs or alcohol.  He shall contribute to the cost of

11  services rendered in an amount to be determined by the

12  probation officer, based on ability to pay or the

13  availability of third-party payment.  He shall refrain

14  from the use of alcohol and other intoxicants during and

15  after treatment.

16          The Defendant shall participate in a mental

17  health program approved by the U.S. Probation Office.  The

18  Defendant shall contribute to the cost of services

19  rendered in an amount to be determined by the probation

20  officer, based on ability to pay or the availability of

21  third-party payment.  He shall refrain from any unlawful

22  use of a controlled substance and submit to a drug test

23  within 15 days of release, on supervised release, and at

24  least two periodic drug tests thereafter for use of a

25  controlled substance.  He shall not possess images or

1   videos of the victims' sexually explicit conduct involving

2   adults, child pornography or visual or text content

3   involving minors which has sexual, prurient or violent

4   interests as an inherent purpose.  He shall avoid and is

5   prohibited from being in any areas or locations where

6   children are likely to congregate such as schools, day

7   care facilities, playgrounds, theme parks, arcades,

8   recreational facilities or recreation parks unless prior

9   approval has been obtained from the probation office.  He

10  shall register as a sex offender in any state where the

11  Defendant resides, is employed, performs volunteer

12  service, carries out a vocation or as a student as

13  required by law.

14              He shall not associate or have contact

15  directly or indirectly with persons under the age of 18

16  except in the presence of a responsible adult who is aware

17  of the nature of the Defendant's background, and who has

18  been approved in advance by the probation officer.  He may

19  not use sexually-oriented telephone numbers or services.

20  He shall submit his person and any property, house,

21  residence, vehicle, papers, computer, other electronic

22  communications or data storage devices, or media and

23  effects to search at any time with or without a warrant by

24  any law enforcement or probation officer with reasonable

25  suspicion concerning a violation of a condition of

21

1    supervised release, probation, or unlawful conduct by the

2    person and by any probation officer in the unlawful

3    discharge of the officer's supervision functions.  Such

4    searches may include the removal of such items for the

5    purpose of conducting a more thorough inspection.  The

6    Defendant shall inform the other residents of this

7    condition.  Failure to submit to a search may be grounds

8    for revocation.

9             The Defendant shall cooperate in the

10   collection of DNA as directed by the probation officer.

11   Now the court's going to recommend the following.  First,

12   that the Defendant participate in the 500-hour drug and

13   alcohol rehabilitation program sponsored by the Bureau of

14   Prisons.  If he has not successfully completed the

15   program, if there is any other program other than the one

16   that he's already successfully completed, because I

17   reviewed the certificate of completion, then he shall

18   participate in that program.

19             Second, that he should be released to --

20   what is the town in Pennsylvania?  Do you have that?

21             MR. MEAD:  Selinsgrove, I believe.

22             THE COURT:  Okay.  Feelinsgrove?

23             MR. MEAD:  Selins with a S.

24             THE COURT:  Okay.

25             MR. BARTH:  Your Honor, I certainly can get

1    you that information.  I was looking in my notes.  I don't

2    have that information.

3              THE COURT:  I'll just leave it in

4    Pennsylvania.  It may not be that particular town.  He

5    should be released in Pennsylvania.  By the way, there was

6    some reference in your materials, those 18 pages, to some

7    finding by this court that you not be released to Vermont.

8    I don't recall that specifically, but if that was, in fact

9    said, it would have been because you had no connection to

10   the state any longer.  Apparently your mother is here at

11   this point.  So --

12             MR. MEAD:  I do have family in Vermont and

13   New York, sir.

14             THE COURT:  Right.  I didn't mean to

15   suggest that that was taken -- to be taken as a bar to you

16   being released to Vermont.

17             MR. MEAD:  It does say for me not to go to

18   New York or Vermont.  I never understood that.

19             THE COURT:  Well that may have been -- -- I

20   don't recall that specifically.  But my sense is that that

21   may have been because of your mother not being present at

22   that point, but I certainly do not intend to bar you being

23   released to Vermont or New York State, especially in light

24   of the changes that you've made.

25             But having said that, it seems to me that

23

1    you've got a good plan to be reintegrated into the

2    community in Pennsylvania, so I'm encouraging that to be

3    said.  But it's not a bar to Vermont.

4                    MR. MEAD:  Okay.  Thank you.

5                    THE COURT:  The guideline fine range is

6    10,000 to $500,000.  Demonstrated an inability to pay a

7    fine.  All fines are waived.  Special assessment of $200

8    is imposed due immediately.  Has that been paid?

9                    MR. BARTH:  I actually don't know.  Terry,

10   are you paying the $200 to the inmate restitution program?

11                   MR. MEAD:  Yeah.  I've already paid that.

12   Completed.

13                   THE COURT:  Okay.  Both the Defendant and

14   the Government may have the right to appeal this sentence

15   as set forth in Title 18 USC section 3742.  If the

16   Defendant is unable to pay the cost of appeal, he has the

17   right to apply for leave to appeal in forma pauperis and

18   request the court to appoint counsel for him.  If the

19   Defendant so requests, the clerk of court shall prepare

20   and file forthwith a notice of appeal on behalf of the

21   Defendant.  Notice of appeal by the Defendant must be

22   filed within 14 days of the date judgment is entered on

23   the Docket pursuant to rule 4(b) of the Federal Rules of

24   Appellate Procedure.

25                        Now we had worked out the rough time when

24

1  you would be eligible for release.  It's fall of -- is it

2  fall of 2017?  Is that --

3                    PROBATION OFFICER:  I believe that's

4  correct.

5                    THE COURT:  All right.  The fall of 2017

6  which gives you some good time to prepare.  So anything

7  further from the Government?

8                    MR. DOHERTY:  There isn't from us, Your

9  Honor.  Thank you.

10                    THE COURT:  Anything further?

11                    MR. BARTH:  No thank you, Your Honor.

12                    THE COURT:  Congratulations, Mr. Mead, in

13 having a reduced sentence, and although I suppose I can

14 debate with counsel here, why the second circuit did what

15 they did.  Good luck.

16                    MR. MEAD:  Thank you.

17                        (Whereupon, the proceeding was

18                        adjourned at 11:40 a.m.)

19                         (Court was in recess at 3:03 p.m.)

20                    C E R T I F I C A T I O N

21             I certify that the foregoing is a correct

22        transcript from the record of proceedings in the

23        above-entitled matter.

24

25

